ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-Feb-19  14:50:43
60CV-21-1276
C06D12 : 13 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
_____ DIVISION

**MARILYN CAMPBELL**                                                    **PLAINTIFF**

**V.**                           **NO. _____**

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**          **DEFENDANT**

_____

### COMPLAINT

_____

### Introduction

1.      This case is ***not*** governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for the reasons stated below.

2.      Marilyn Campbell ("Campbell") brings this action to recover long term disability benefits due to her under a group long term disability policy issued by The Lincoln National Life Insurance Company ("Lincoln") to her employer, EdFinancial Services LLC ("EdFinancial"), covering only employees of EdFinancial working on "Government Contracts," including a Government Contract under which Campbell worked exclusively for the Arkansas Student Loan Authority ("Authority").

3.      This case is governed by Arkansas law, and not by ERISA, because Lincoln's policy was a "governmental plan" excluded from ERISA's application.  29 U.S.C. §§ 1003(b)(1) & 1002(32); *see also* U.S. Department of Labor Opinion 86-2 A, 1986 ERISA LEXIS 6, *6 (1986) (governmental plans are not limited to those established by unilateral action of employers which are governmental agencies but also include other plans covering only employees of governmental entities, as here).

4.      In accordance with Ark. R. Civ. P. 10(d), a copy of Lincoln's policy is attached.  Exhibit 1.

5.     The Government Contract under which Campbell worked for the Authority is also attached.  Exhibit 2.

### Parties

6.     Campbell was a resident of Pulaski County, Arkansas at the time of the loss described herein and is currently a citizen of Arkansas.

7.     Lincoln is a foreign corporation, organized by the laws of Indiana with its home office in Nebraska, which may be served with process at:

> The Lincoln National Life Insurance Company
> c/o Corporation Service Company
> 300 Spring Building
> Suite 900
> 300 S. Spring Street
> Little Rock, AR 72201

### Jurisdiction & Venue

8.     This court has jurisdiction under Ark. Code Ann. § 16-13-201(a) and the Arkansas Constitution, Amendment 80, § 6(A), each of which state that circuit courts shall have original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Arkansas Constitution.  This is a justiciable matter not otherwise assigned pursuant to the Arkansas Constitution.

9.     Pleading in the alternative in accordance with Ark. R. Civ. P. 8(a), if this court were to determine that ERISA were applicable, this court would have jurisdiction under ERISA, 29 U.S.C. § 1132(e)(1), which states that state courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of a civil action brought by a participant or beneficiary to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of the plan, and to clarify her rights to future benefits under the terms of the plan.

2

10.     This court is the proper venue under Ark. Code Ann. § 23-79-204, which states that an action brought by an insured against an insurer as to a loss occurring under an insurance policy shall be brought in either the county in which the loss occurred or the county of the insured's residence at the time of the loss.  Campbell was a resident of Pulaski County, Arkansas, at the time of the loss described herein.

**Facts**

11.     Beginning in 2006, Campbell was an employee of EdFinancial.

12.     Campbell's job was Manager of Operations.

13.     Campbell provided services exclusively for the Authority, a governmental entity, as shown below.

14.     Campbell worked under a Government Contract between EdFinancial and the Authority.  Exhibit 2 (Government Contract).

15.     The Government Contract stated that the Authority was "a body politic and corporate and an instrumentality of the State of Arkansas."  Exhibit 2, page 15.

16.     The Government Contract stated that EdFinancial would "perform all necessary administrative and related activities for the Authority with respect to the Authority's Loan Programs, including providing staff and personnel."  Exhibit 2, page 16, § 2.1.

17.     Lincoln issued a Group Long-Term Disability Policy to EdFinancial.  Exhibit 1.

18.     Lincoln's policy insured only employees of EdFinancial working on "Government Contracts."  Exhibit 1, page 4.

19.     Campbell was an insured under Lincoln's policy.

3

20.     Campbell developed chronic pain in her head, neck, back, hip, and joints, reduced sleep, lost attention and concentration, and other problems related thereto.

21.     Campbell underwent surgery and other procedures from three orthopedic surgeons and a pain management physician to relieve her chronic pain, but unsuccessfully.

22.     Campbell received physical therapy multiple times, opiates, steroids, epidurals, and other injectable therapies and medications to relieve chronic pain, but with only minimal success.

23.     Campbell still takes medications for chronic pain that, along with the pain itself, decrease her attention and concentration and her ability to work both mentally and physically.

24.     On 10/21/2017, due to her above problems, Campbell became unable to perform her own occupation under the terms of Lincoln's policy.

25.     On 12/15/2017 and 01/10/2018, Lincoln sent letters to Campbell stating that her claim for long term disability benefits was approved, and Lincoln commenced making payments to Campbell under its policy, showing that Lincoln determined that Campbell was unable to perform her own occupation under the terms of its policy.

26.     Campbell's medical condition did not thereafter improve.

27.     No record from any treating physician or other source indicated any improvement in Campbell's medical condition, including up to today.

28.     Lincoln paid disability benefits to Campbell for nearly two years.

4

29.     On 10/23/2019, Lincoln sent a letter to Campbell stating that no further benefits were payable beyond 10/19/2019, and Lincoln stopped making payments to Campbell.

30.     Lincoln eventually paid long term disability to Campbell benefits up to 01/19/2020, representing the remainder of the "own occupation" period in Lincoln's policy, after Campbell had submitted multiple appeals, but Lincoln did not pay benefits beyond that date and has not paid any benefits under the "any occupation" period in Lincoln's policy.

31.     Lincoln also terminated an Extension Death Benefit.

32.     Lincoln's sole evidentiary basis for terminating Campbell's benefits was an "Independent Peer Review" report obtained from Mostafa Farache, M.D., a neurologist in Minnesota who reviewed records but did not examine Ms. Campbell.

33.     Dr. Farache did not address in his report whether Ms. Campbell was able to mentally perform her own occupation or any occupation, and thus Lincoln terminated her benefits without any evidentiary basis for deciding that Campbell could perform the mental duties her own occupation.

34.     Dr. Farache generally discussed medical treatment records in his report but did ***not*** ***cite*** ***any*** ***specific*** ***medical*** ***treatment*** ***record*** in support of his conclusions as to Campbell's physical abilities, and thus Lincoln terminated her benefits without any evidentiary basis for deciding that Campbell could perform the physical duties of her own occupation.

35.     Lincoln thereafter submitted reports from Neil Patel, M.D., and Roger Belcourt, M.D., each of whom, like Dr. Farache before them, concluded that Campbell

was not disabled but also did ***not cite any specific medical treatment record*** in support of their conclusions.  These reports were untimely submitted after Campbell had submitted her appeal and considerable supporting materials under ERISA's claims procedure regulation, 29 C.F.R. § 2560.503-1.

36.     Lincoln required Campbell to submit ***five appeals*** – dated 02/21/2020, 06/19/2020, 10/27/2020, 11/30/2020, and 01/11/2021 – before providing Campbell with a final decision, knowing that Campbell was going without working income or disability benefits during that time.  No language in Lincoln's policy, ERISA's claims procedure regulation, 29 C.F.R. § 2560.503-1, or any law allowed Lincoln to require five appeals. Nonetheless, Campbell submitted the five appeals and supporting materials.

37.     In addition to requiring the five appeals, Lincoln repeatedly sent Campbell untimely reports from its reviewing physicians, employee nurses, and a vocational specialists and repeatedly misrepresented that a "new rule" from the Department of Labor allowed a "21-day period" for she or her treating physicians to respond, thereby continually attempting to place additional undue burdens on Campbell and her treating physicians to respond, when no such Department of Labor regulation or rule so states. Campbell has repeatedly asked Lincoln to cite this regulation or rule, and Lincoln has never done so.  No language in Lincoln's policy, ERISA's claims procedure regulation, 29 C.F.R. § 2560.503-1, or any law allowed Lincoln to make this representation about a 21-day period.

38.     On 02/18/2021, after ***16 months*** of not paying benefits and after unfairly requiring Campbell to submit five appeals, Lincoln finally issued a letter providing a final

denial of Campbell's claim and conceding for the first time that she had "exhausted all rights of appeal" and was free to file this action.

39.    Campbell is unable to perform any occupation under the terms of Lincoln's policy, is entitled to long term disability benefits under that policy, and is entitled to an Extension Death Benefit under that policy.

## Breach of Insurance Contract

40.    All allegations herein are incorporated in this part.

41.    Lincoln issued a Group Long-Term Disability Insurance Policy under which Campbell was an insured.

42.    After deciding that Campbell was disabled under the policy and paying benefits for nearly two years, and without evidence of any improvement in Campbell's medical condition, Lincoln stopped paying those benefits.

43.    Campbell presented proof to Lincoln that she was entitled to be paid further disability benefits under the policy, including "any occupation" long term disability benefits and an Extension Death Benefit.

44.    Campbell asked Lincoln to pay those benefits.

45.    Lincoln declined to pay those benefits.

46.    Lincoln therefore breached the policy.

## Deceptive Trade Practices

47.    All allegations herein are incorporated in this part.

48.    The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "[e]ngaging in any ... unconscionable, false, or deceptive act or practice in business, commerce, or trade," Ark. Code Ann. § 4-88-107(a)(10).

49.     The ADTPA states "An elder person or person with a ***disability*** who suffers damage or injury as a result of an offense or violation described in this chapter has a cause of action to recover actual damages, punitive damages, if appropriate, and reasonable attorney's fees." Ark. Code Ann. § 4-88-204 (emphasis added).

50.     Under the ADTPA, acts and practices in "business, commerce, or trade" constitute "consumer-oriented" acts and practices, including those discussed herein. *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 963 (8th Cir. 2015) ("The Deceptive Trade Practices Act, however, prohibits unconscionable acts or practices 'in business, commerce, or trade,' Ark. Code § 4-88-107(a)(10), and thus governs only 'consumer-oriented' action.") (citing *Skalla v. Canepari*, 2013 Ark. 415 (Ark. 2013); *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015)).

51.     Parties are not prevented by the terms of the ADTPA or its safe harbor provision from asserting causes of action under the ADTPA relating to insurance. *Willsey v. Shelter Mutual Ins. Co.*, W.D. Ark. Case No.: 2:12-CV-02320-RTD (Memorandum and Order entered 08/16/2013 by U.S. District Judge Robert T. Dawson as Document 49).

52.     Although the Arkansas General Assembly amended the ADTPA by Act 986 of 2017, those amendments did not eliminate any of the damages recoverable by a person with a disability under Ark. Code Ann. § 4-88-204, as discussed in the Comment to AMI 2900 in the Arkansas Model Jury Instructions – Civil, which states:

> Act 986's amendment of Ark. Code Ann. § 4-88-102 (definition of "actual financial loss") and -113(f) ("damages available as the result of an offense or violation of a deceptive trade practice prohibition") does not appear to reach Subchapter 2 of the ADTPA, which provides "Enhanced Penalties when Elder or Disabled Persons Are Targeted" for violations "of this chapter." In particular, Act 986 does not expressly amend Ark. Code

8

Ann. § 4-88-201, which provides an additional civil penalty for violations against elder or disabled persons; nor does it expressly amend § 4-88-204, which recognizes a cause of action on behalf of elder or disabled persons who suffer "damage or injury as a result of an offense or violation described in this chapter."

53.     Lincoln engaged in unconscionable, false, or deceptive acts or practices in business, commerce, or trade, which constituted consumer-oriented acts, and violated the above provisions of the ADTPA, as described herein.

54.     Those acts included those below and potentially others to be revealed in discovery or over time:

(1)     Terminating Campbell's disability benefits despite finding that Campbell was disabled and paying those benefits for nearly two years, without any new evidence of an improvement in Campbell's medical condition, and without any new evidence that Campbell could either mentally or physically perform her own occupation or any occupation.

(2)     Untimely providing reports from reviewing physicians, employee nurses, and vocational specialists after Campbell had submitted her appeal and supporting materials in accordance with ERISA's claim procedure regulation, 29 C.F.R. § 2560.501-1 (which Lincoln contends governs Campbell's claim), and thereby violating that regulation and unfairly placing Campbell in a position of not having addressed Lincoln's untimely reports in her original appeal or of having to repeatedly ask treating physicians, who are not available for hire in litigation as are Lincoln's several reviewing physicians and who are instead busy with patient care, to take time out to repeatedly respond to new and untimely reports by Lincoln's reviewing physicians and others.

9

(3)  Repeatedly and falsely asserting to Campbell that there was a "new rule" issued by the Department of Labor providing a "21-day period" for Campbell or her treating physicians to respond to the repeated and untimely new reports from Lincoln's reviewing physicians and other report writers, thereby seeking to place undue burdens on Campbell and her treating physicians to respond, when in fact no such period exists in any regulation or rule and Lincoln has never cited any regulation or rule containing such a period despite the repeated requests of Campbell that it do so.

(4)  Requiring Campbell to submit *five appeals* – dated 02/21/2020, 06/19/2020, 10/27/2020, 11/30/2020, and 01/11/2021 – before providing Campbell with a final decision, knowing that Campbell was going without working income or disability benefits during that time.  No language in Lincoln's policy; ERISA's claims procedure regulation, 29 C.F.R. § 2560.503-1; or any law allowed Lincoln to require five appeals.

(5)  Requiring Ms. Campbell to wait *16 months* after terminating her benefits before providing a final denial of her claim and conceding for the first time that she had "exhausted all rights of appeal" and was free to file this action, knowing that Campbell was going without working income or disability benefits during that time.

(6)  Doing all the above in an unfair attempt to discourage Campbell from pursuing her claim for benefits, increase the changes that she would not perfect her claim by failing to submit the five different appeals unreasonably required by Lincoln, attempting to place Campbell in a position of not responding

10

to its reviewing physician reports and other reports by providing them repeatedly and untimely after Campbell had submitted her appeal and supporting materials.

(7)     Otherwise acting in an unfair, unreasonable, dishonest, oppressive, unconscionable, false, and deceptive manner to deny Campbell benefits that Lincoln owes to her.

## ERISA

55.     All allegations herein are incorporated in this part.

56.     Although Campbell pleads that this case is governed by Arkansas law, and not by ERISA, she pleads in the alternative for relief under ERISA in accordance with Ark. R. Civ. P. 8(a) and Fed. R. Civ. P. 8(a)(3).

57.     Lincoln wrongfully terminated Campbell's disability benefits and denied her appeal even though Lincoln had no evidentiary basis for doing so and was presented with evidence that Campbell was disabled under the terms of the policy.

58.     Pursuant to ERISA, 29 USC § 1132(a)(1)(B), Campbell, as a participant or beneficiary of the policy, may bring a civil action to recover benefits due to her under the terms of the policy, to enforce her rights under the terms of the policy, and to clarify her rights to future benefits under the terms of the policy.

## Damages & Relief

59.     All allegations herein are incorporated in this part.

60.     Lincoln owes Campbell past due disability benefits from 01/19/2020 to the date of the judgment.

61.     Lincoln owes Campbell reinstatement of her disability benefits and payment of those benefits into the future so long as she remains eligible for those benefits under the terms of the policy.

62.     Lincoln owes Campbell a Death Extension Benefit.

63.     Lincoln owes Campbell 12% damages upon the amount of the loss under Ark. Code. Ann. § 23-79-208.

64.     Lincoln should be required to pay Campbell all reasonable attorney's fees for the prosecution and collection of the loss under Ark. Code. Ann. § 23-79-208, or alternatively under ERISA, 29 U.S.C. § 1132(g).

65.     Lincoln should be required to pay Campbell the costs of litigation.

66.     Lincoln should be required to pay Campbell pre-judgment interest from 01/19/2020 to the date of the judgment.

67.     Lincoln should be required to pay punitive damages.

68.     Campbell prays for a recovery in excess of the amount required for federal court jurisdiction in diversity of citizenship cases.

### Jury Trial

69.     Campbell demands a trial by jury of any issue triable of right by a jury.

### Prayer for Relief

WHEREFORE, Campbell prays for judgment against Lincoln, in excess of the amount required for federal court jurisdiction in diversity of citizenship cases, for all damages suffered, past due disability benefits from 01/19/2020 to the date of the judgment, reinstatement of her disability benefits and payment of those benefits into the future so long as she remains eligible for those benefits under the terms of the policy, a Death Extension Benefit, 12% damages upon the amount of the loss, reasonable attorney's fees, pre-judgment interest, punitive damages, post-judgment interest, costs, and all other relief to which she is entitled.

12

Respectfully submitted,

*/s/ Neil Chamberlin*
Neil Chamberlin, # 93222
MCMATH WOODS, P.A.
711 West Third Street
Little Rock, AR 72201
Telephone 501-374-5411
Facsimile 501-374-5118
neil@mcmathlaw.com

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-Feb-19  14:50:43
60CV-21-1276
C06D12 : 52 Pages

AMENDMENT NO.  2

TO BE ATTACHED TO AND MADE PART OF GROUP POLICY NO.:  000010199742

ISSUED TO:  EdFinancial Services LLC

It is agreed that the above policy be replaced with the attached Policy, which is revised and dated January 1, 2015.


The effective date of this amendment is January 1, 2015; but only with respect to disabilities incurred on or after that date.  Nothing contained in this amendment shall change any of the terms and conditions of this Policy; except as stated above.

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**

Officer of the Company


Accepted by the Group Policyholder this _____ day of _____ 20_____

By _____    Title _____

GL1100 AMEND.                          **EXHIBIT 1, page 1**

 **Lincoln** Financial Group®

**The Lincoln National Life Insurance Company**
A Stock Company   Home Office Location:  Fort Wayne, Indiana
Group Insurance Service Office:  8801 Indian Hills Drive, Omaha, NE 68114-4066
1-800-423-2765   Online: www.LincolnFinancial.com

In Consideration of the Application for this Policy made by

<div align="center">

**EdFinancial Services LLC**

(herein called the Policyholder)
</div>

and the payment of all premiums when due, The Lincoln National Life Insurance Company agrees to make the payments provided in this Policy to the person or persons entitled to them.

Policy No.  000010199742    Policy Effective Date:  January 1, 2015.

Monthly Premium:  0.190% of Total Covered Payroll per Month

The above rate or rates are guaranteed until January 1, 2018, unless any of the Policy's terms are changed.

Policy Anniversaries will be annual beginning on:  January 1, 2018

The first premium is due on this Policy's Effective Date, and subsequent premiums are due on February 1, 2015, and on the same day of each month thereafter.

This Policy is delivered in the state of Tennessee and subject to the laws of that jurisdiction.

The Lincoln National Life Insurance Company has executed this Policy at its Group Insurance Service Office in Omaha, Nebraska this 7th day of April, 2016.

SECRETARY

PRESIDENT

<div align="center">

**GROUP LONG-TERM DISABILITY INSURANCE POLICY**

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
</div>

GL3001-LTD-1 10

Policy Face Page
01/01/15

<div align="center">

**EXHIBIT 1, page 2**
</div>

# TABLE OF CONTENTS

Schedule of Benefits..................................................................................................................... 3

Definitions ...................................................................................................................................6

General Provisions.................................................................................................................... 12

Claims Procedures.................................................................................................................... 14

Eligibility.................................................................................................................................. 18

Effective Dates.......................................................................................................................... 18

Individual Termination.............................................................................................................. 20

Policy Termination.....................................................................................................................21

Premiums and Premium Rates.................................................................................................. 22

Total Disability Monthly Benefit ..............................................................................................23

Progressive Income Benefit...................................................................................................... 24

Partial Disability Monthly Benefit............................................................................................26

Other Income Benefits ............................................................................................................. 28

Recurrent Disability.................................................................................................................. 31

Exclusions ................................................................................................................................ 32

Specified Injuries or Sicknesses Limitation.............................................................................33

Mandatory Vocational Rehabilitation Benefit Provision (Value)........................................... 35

Reasonable Accommodation Benefit.........................................................................................36

Prior Insurance Credit Upon Transfer of Insurance Carriers...................................................37

Family Income Benefit.............................................................................................................. 38

Family Care Expense Benefit.................................................................................................... 39

Notice........................................................................................................................................41

GL3001-LTD-2

01/01/15

**EXHIBIT 1, page 3**

**EdFinancial Services LLC**
**000010199742**
**SCHEDULE OF BENEFITS**

**ELIGIBLE CLASSES**

Class 1      All Full-Time and Regular Part-Time Employees working 30 hour or more per week Excluding Regular Part-Time Employees not working on Government Contracts

Class 2      All Regular Part-Time Employees Working on Government Contracts Working less than 30 hours a week but not less than 1 hour a week

GL3001-LTD-SB

3
**EXHIBIT 1, page 4**

01/01/15

**EdFinancial Services LLC**
**000010199742**
**SCHEDULE OF BENEFITS**
For
**Class 1 - All Full-Time and Regular Part-Time Employees working 30 hour or more per week Excluding Regular Part-Time Employees not working on Government Contracts**

MINIMUM HOURS:     30 hours per week

WAITING PERIOD:     (For date insurance begins, refer to "Effective Date" section)
                    30 days of continuous Active Work

CONTRIBUTIONS:     Insured employees are not required to contribute to the cost of the Long-Term Disability coverage.

### LONG-TERM DISABILITY BENEFITS

BENEFIT PERCENTAGE:     66 2/3%

MAXIMUM MONTHLY BENEFIT:     $6,000

MINIMUM MONTHLY BENEFIT:     $100

Long-Term Disability Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

The Maximum Monthly Benefit will not exceed the Benefit Percentage times Basic Monthly Earnings.

ELIMINATION PERIOD: 90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

MAXIMUM BENEFIT PERIOD:  (For Sickness, Injury or Pre-Existing Conditions): The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees.

GL3001-LTD-SB

4
**EXHIBIT 1, page 5**

01/01/15

**EdFinancial Services LLC**
**000010199742**
**SCHEDULE OF BENEFITS**
**For**
**Class 2 - All Regular Part-Time Employees Working on Government Contracts Working less than 30 hours a week but not less than 1 hour a week**

MINIMUM HOURS:   1 hours per week

WAITING PERIOD:   (For date insurance begins, refer to "Effective Date" section)
30 days of continuous Active Work

CONTRIBUTIONS:   Insured employees are not required to contribute to the cost of the Long-Term Disability coverage.

### LONG-TERM DISABILITY BENEFITS

BENEFIT PERCENTAGE:     66 2/3%

MAXIMUM MONTHLY BENEFIT:     $6,000

MINIMUM MONTHLY BENEFIT:     $100

Long-Term Disability Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

The Maximum Monthly Benefit will not exceed the Benefit Percentage times Basic Monthly Earnings.

ELIMINATION PERIOD: 90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

MAXIMUM BENEFIT PERIOD:  (For Sickness, Injury or Pre-Existing Conditions): The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees.

GL3001-LTD-SB

**EXHIBIT 1, page 6**

01/01/15

## DEFINITIONS

**As used throughout this Policy, the following terms shall have the meanings indicated below. Other parts of this Policy contain definitions specific to those provisions.**

**ACTIVE WORK** or **ACTIVELY AT WORK** means an Employee's full-time performance of all Main Duties of his or her Own Occupation, for the regularly scheduled number of hours, at:
1. the Employer's usual place of business; or
2. any other business location where the Employer requires the Employee to travel.

Unless disabled on the prior workday or on the day of absence, an Employee will be considered Actively at Work on the following days:
1. a Saturday, Sunday or holiday that is not a scheduled workday;
2. a paid vacation day or other scheduled or unscheduled non-workday; or
3. a non-medical leave of absence of 12 weeks or less, whether taken with the Employer's prior approval or on an emergency basis.

This includes a Military Leave or an approved Family or Medical Leave that is **not** due to the Employee's own health condition.

**ANNUAL SALARY** means the Insured Employee's **BASIC MONTHLY EARNINGS or PREDISABILITY INCOME** multiplied by 12.

**BASIC MONTHLY EARNINGS** or **PREDISABILITY INCOME** means the Insured Employee's average monthly base salary or hourly pay from the Employer before taxes on the Determination Date. The **"Determination Date"** is the last day worked just prior to the date the Disability begins.

It does **not** include commissions, bonuses, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Employer. It will not exceed the amount shown in the Employer's financial records, the amount for which premium has been paid, or the Maximum Covered Monthly Earnings permitted by this Policy; whichever is less. (Maximum Covered Monthly Earnings equals the Maximum Monthly Benefit divided by the Benefit Percentage shown in the Schedule of Benefits.) Exception: For purposes of determining the Partial Disability Monthly Benefit, Basic Monthly Earnings will not exceed the amount shown in the Employer's financial records.

**COMPANY** means The Lincoln National Life Insurance Company, an Indiana corporation. Its Group Insurance Service Office address is 8801 Indian Hills Drive, Omaha, Nebraska 68114-4066.

**DAY** or **DATE** means the period of time that begins at 12:01 a.m. and ends at 12:00 midnight, standard time, at the Policyholder's place of business. When used with regard to effective dates, it means 12:01 a.m. When used with regard to termination dates, it means 12:00 midnight.

**DISABILITY** or **DISABLED** means Total Disability or Partial Disability.

**DISABILITY BENEFIT,** when used with the term Retirement Plan, means a benefit that:
1. is payable under a Retirement Plan due to disability as defined in that plan; and
2. does not reduce the benefits that would have been paid as Retirement Benefits at the normal retirement age under the plan if the disability had not occurred.

If the payment of the benefit does cause such a reduction, the benefit will be deemed a Retirement Benefit as defined in this Policy.

**DEFINITIONS**
**(Continued)**

**ELIMINATION PERIOD** means the number of days of Disability during which no benefit is payable.  The Elimination Period is shown in the Schedule of Benefits.  It applies as follows.
1.  The Elimination Period:
    a.   begins on the first day of Disability; and
    b.   is satisfied when the required number of days is accumulated within a period which does not exceed two times the Elimination Period.
    During a period of Disability, the Insured Employee may return to full-time work, at his or her own or any other occupation, for an accumulated number of days not to exceed the Elimination Period.
2.  Only days of Disability caused by the same or a related Sickness or Injury will count towards the Elimination Period.  Days on which the Insured Employee returns to full-time work will not count towards the Elimination Period.

**EMPLOYEE** or **FULL-TIME EMPLOYEE** or **REGULAR PART-TIME EMPLOYEE** means a person:
1.  whose employment with the Employer is the person's main occupation;
2.  whose employment is for regular wage or salary, on a full-time or part-time basis;
3.  who is regularly scheduled to work at such occupation at least the Minimum Hours shown in the Schedule of Benefits;
4.  who is a member of an Eligible Class which is eligible for coverage under this Policy;
5.  who is not a temporary or seasonal employee; and
6.  who is a citizen of the United States or legally works in the United States.

**EMPLOYER** means the Policyholder.  It includes any division, subsidiary or affiliated company named in the Application or Participation Agreement.

**EVIDENCE OF INSURABILITY** means a statement of proof of an Employee's medical history.  The Company uses this to determine his or her acceptance for insurance or an increased amount of insurance.  Such proof will be provided at the Employee's own expense.

**FAMILY OR MEDICAL LEAVE** means an approved leave of absence that:
1.  is subject to the federal FMLA law (the Family and Medical Leave Act of 1993 and any amendments to it) or a similar state law;
2.  is taken in accord with the Employer's leave policy and the law which applies; and
3.  does not exceed the period approved by the Employer and required by that law.

Under the federal FMLA law, such leaves are permitted for up to 12 weeks in a 12-month period, as defined by the Employer.  The 12 weeks:
1.  may consist of consecutive or intermittent work days; or
2.  may be granted on a part-time equivalency basis.
If an Employee is entitled to a leave under both the federal FMLA law and a similar state law, he or she may elect the more favorable leave (but not both).  If an Employee is on an FMLA leave due to his or her own health condition on the date Policy coverage takes effect, he or she is not considered Actively at Work.

**FULL-TIME,** as it applies to the Partial Disability Monthly Benefit, means the average number of hours the Insured Employee was regularly scheduled to work, at his or her Own Occupation, during the month just prior to:
1.  the date the Elimination Period begins; or
2.  the date an approved leave of absence begins, if the Elimination Period begins while the Insured Employee is continuing coverage during a leave of absence.

In no event will it exceed 40 hours per week.

GL3001-LTD-3 10 TN

### DEFINITIONS
### (Continued)

**GAINFUL OCCUPATION** means any occupation in which the Insured Employee:
1.   is or could reasonably become qualified, considering his or her education, training, experience, mental and physical abilities;
2.   could reasonably find employment, considering the demand in the national labor force; and
3.   could earn (or reasonably expect to earn) a before-tax income at least equal to 66 2/3% of his or her Predisability Income, within 12 months of returning to work.

**INJURY** means an accidental bodily Injury that:
1.   requires treatment by a Physician; and
2.   directly, and independently of all other causes, results in a Disability that begins while the Insured Employee is insured under this Policy.

**INSURANCE MONTH** or **POLICY MONTH** means that period of time:
1.   beginning at 12:01 a.m. Standard Time, at the Policyholder's place of business on the first day of any calendar month; and
2.   ending at 12:00 midnight on the last day of the same calendar month.

**INSURED EMPLOYEE** means an Employee for whom Policy coverage is in effect.

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1.   are normally required to perform the Insured Employee's Own Occupation; and
2.   could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation.  It will apply the Act's standards, whether or not:
1.   the Employer is subject to the Act; or
2.   the Insured Employee has requested such a job accommodation.
An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

Main Duties include those job tasks:
1.   as described in the U.S. Department of Labor Dictionary of Occupational Titles; and
2.   as performed in the general labor market and national economy.
Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site.

**MEDICALLY APPROPRIATE TREATMENT** means diagnostic services, consultation, care or services that are consistent with the symptoms or diagnosis causing the Insured Employee's Disability.  Such treatment must be rendered:
1.   by a Physician whose license and any specialty are consistent with the disabling condition; and
2.   according to generally accepted, professionally recognized standards of medical practice.

**MILITARY LEAVE** means a leave of absence that:
1.   is subject to the federal USERRA law (the Uniformed Services Employment and Reemployment Rights Act of 1994 and any amendments to it);
2.   is taken in accord with the Employer's leave policy and the federal USERRA law; and
3.   does not exceed the period required by that law.

**MONTHLY BENEFIT** means the amount payable monthly by the Company to the Insured Employee who is Totally Disabled or Partially Disabled.

GL3001-LTD-3 10 TN

01/01/15

## DEFINITIONS
### (Continued)

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:
1.    in which the Insured Employee was employed with the Employer prior to Disability; and
2.    which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.  It includes any work in the same occupation for pay or profit, regardless of:
1.    whether such work is with the Employer, with some other firm, or on a self-employed basis; or
2.    whether a suitable opening is currently available with the Employer or in the local labor market.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**PARTIAL DISABILITY** or **PARTIALLY DISABLED** will be defined as follows:
1.    During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
    - a.    is unable to perform one or more of the Main Duties of his or her Own Occupation; or is unable to perform such duties full-time; and
    - b.    is engaged in Partial Disability Employment.
2.    After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
    - a.    is unable to perform one or more of the Main Duties of any Gainful Occupation; or is unable to perform such duties full-time; and
    - b.    is engaged in Partial Disability Employment.

**PARTIAL DISABILITY EMPLOYMENT** means the Insured Employee is working at his or her Own Occupation or any other occupation; however, because of a Partial Disability:
1.    the Insured Employee's hours or production is reduced; or
2.    one or more Main Duties of the job are reassigned; or
3.    the Insured Employee is working in a lower-paid occupation.

During Partial Disability Employment, his or her current earnings:
1.    must be at least 20% of Predisability Income; and
2.    may not exceed the percentage specified in the Partial Disability Benefit section.

**PHYSICIAN** means:
1.    a legally qualified medical doctor who is licensed to practice medicine, to prescribe and administer drugs, or to perform surgery; or
2.    any other duly licensed medical practitioner who is deemed by state law to be the same as a legally qualified medical doctor.

The medical doctor or other medical practitioner must be acting within the scope of his or her license.  He or she must be qualified to provide Medically Appropriate Treatment for the Insured Employee's disabling condition.

Physician does **not** include the Insured Employee or a relative of the Insured Employee receiving treatment.  Relatives include:
1.    the Insured Employee's spouse, siblings, parents, children and grandparents; and
2.    his or her spouse's relatives of like degree.

**POLICY** means this group insurance Policy issued by the Company to the Policyholder.

**POLICYHOLDER** means the person, company, trust or other organization as shown on the Face Page of this Policy.

**PREDISABILITY INCOME**—See Basic Monthly Earnings definition.

GL3001-LTD-3 10 TN

9

**EXHIBIT 1, page 10**

01/01/15

## DEFINITIONS
### (Continued)

**REGULAR CARE OF A PHYSICIAN** or **REGULAR ATTENDANCE OF A PHYSICIAN** means the Insured Employee:
1. personally visits a Physician, as often as medically required according to standard medical practice to effectively manage and treat his or her disabling condition; and
2. receives Medically Appropriate Treatment, by a Physician whose license and any specialty are consistent with the disabling condition.

**REGULAR OCCUPATION**—See Own Occupation or Regular Occupation definition.

**RETIREMENT BENEFIT,** when used with the term Retirement Plan, means a benefit that:
1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;
2. does not represent contributions made by an Insured Employee (Payments representing Employee contributions are deemed to be received over the Insured Employee's expected remaining life, regardless of when they are actually received.); and
3. is payable upon:
   a. early or normal retirement; or
   b. disability (if the payment does reduce the benefit which would have been paid at the normal retirement age under the plan, if disability had not occurred).

**RETIREMENT PLAN** means a defined benefit or defined contribution plan that:
1. provides Retirement Benefits to Employees; and
2. is not funded wholly by Employee contributions.

The term shall **not** include any 401(k), profit-sharing or thrift plan; informal salary continuance plan; individual retirement account (IRA); tax sheltered annuity (TSA); stock ownership plan; or a non-qualified plan of deferred compensation.

An Employer's Retirement Plan is deemed to include any Retirement Plan:
1. which is part of any federal, state, county, municipal or association retirement system; and
2. for which the Insured Employee is eligible as a result of employment with the Employer.

**SICK LEAVE** or **SALARY CONTINUANCE PLAN** means a plan that:
1. is established and maintained by the Employer for the benefit of Employees; and
2. continues payment of all or part of an Insured Employee's Predisability Income for a specified period after he or she becomes Disabled.
It does **not** include compensation the Employer pays an Insured Employee for work actually performed during a Disability.

**SICKNESS** means illness, pregnancy (including its complications) or disease.

**TOTAL COVERED PAYROLL** means the total amount of Basic Monthly Earnings for all Employees insured under this Policy.

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any Gainful Occupation.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

**DEFINITIONS**
**(Continued)**

**WAITING PERIOD** means the period of time an Employee must be employed in an eligible class with the Employer, before he or she becomes eligible to enroll for coverage under this Policy.  The period of service must be continuous, except as explained in the Eligibility provision captioned Prior Service Credit Towards Waiting Period.

GL3001-LTD-3 10 TN

**EXHIBIT 1, page 12**

01/01/15

## GENERAL PROVISIONS

**ENTIRE CONTRACT**.  The entire contract between the parties shall consist of:
1. this Policy and any amendments to it;
2. the Policyholder's application (a copy of which is attached);
3. any Participating Employers' applications or Participation Agreements; and
4. any individual applications of the Insured Employees.

In the absence of fraud, all statements made by the Policyholder and by Insured Employees are representations and not warranties.  No statement made by an Insured Employee will be used to contest the coverage provided by this Policy, unless:
1. it is contained in a written statement signed by that Insured Employee; and
2. a copy of the statement has been furnished to that Insured Employee.

**AUTHORITY TO MAKE OR AMEND CONTRACT**.  Only a Company Officer located in the Company's Group Insurance Service Office has the authority to:
1. determine the insurability of a group or any individual within a group;
2. make a contract in the Company's name;
3. amend or waive any provision of this Policy; or
4. extend the time for payment of any premium.

No change in this Policy will be valid, unless it is made in writing and signed by such a Company Officer.

**INCONTESTABILITY.**  Except for the non-payment of premiums or fraud, the Company may not contest the validity of this Policy after it has been in force for two years from its date of issue; and as to any Insured Employee, after his or her coverage has been in force for two years during his or her lifetime.  This clause does not preclude, at any time, the assertion of defenses based upon:
1. this Policy's eligibility requirements, exclusions and limitations; and
2. other Policy provisions unrelated to the validity of coverage.

**RESCISSION.**  The Company has the right to rescind any insurance for which Evidence of Insurability was required, if:
1. an Insured Employee incurs a claim during the first two years of coverage; and
2. the Company discovers that the Insured Employee made a Material Misrepresentation on his or her application.

A **"Material Misrepresentation"** is an incomplete or untrue statement that caused the Company to issue coverage that it would have disapproved, had it known the truth.  **"To rescind"** means to cancel insurance back to its effective date.  In that event, the Company will refund all premium paid for the rescinded insurance, less any benefits paid for the Insured Employee's claims.  The Company reserves the right to recover any claims paid in excess of such premiums.

**NON-PARTICIPATION**.  This is a non-participating Policy.  It will not share in the divisible surplus of the Company.

**INFORMATION TO BE FURNISHED**.  The Employer is required to furnish the Company any information needed to administer this Policy, including:
1. information about Employees:
   a. who become eligible for insurance;
   b. whose amounts of coverage change; or
   c. whose eligibility or coverage ends;
2. occupational information and other facts that may be needed to manage a claim; and
3. any other information that the Company may reasonably require.

The Company may inspect any of the Employer's records that relate to this Policy, at any reasonable time.

## GENERAL PROVISIONS
### (Continued)

Clerical error by the Employer:
1. will not void or terminate insurance that otherwise would be in effect;
2. will not result in insurance coverage that otherwise would not be in effect; and
3. will not continue insurance that otherwise would be terminated.

Once an error is discovered, a fair adjustment in premium will be made. If a premium adjustment involves the return of unearned premium, the amount of the return will be limited to the 12-month period that precedes the date the Company receives proof that such an adjustment should be made.

**MISSTATEMENTS OF FACTS**. If relevant facts about any person were misstated:
1. a fair adjustment of the premium will be made; and
2. the true facts will decide if and in what amount insurance is valid under this Policy.

If an Insured Employee's age has been misstated, any benefits shall be in the amount the paid premium would have purchased at the correct age.

**ACTS OF THE POLICYHOLDER**. In administering this Policy, the Policyholder must:
1. treat Employees the same in like situations; and
2. allow the Company, without inquiry, to rely on its acts.

**POLICYHOLDER'S AGENCY**. For all purposes of this Policy, the Policyholder acts on its own behalf or as the Employee's agent. Under no circumstances will the Policyholder be deemed the Company's agent.

**CERTIFICATES**. The Employer will be furnished with individual Certificates for delivery to each Insured Employee. These Certificates summarize the benefits provided by this Policy. If there is a conflict between this Policy and the Certificate, this Policy will control.

**CONFORMITY WITH STATE STATUTES**. If, on its effective date, any provision of this Policy conflicts with any applicable law, the provision will be deemed to conform to the minimum requirements of the law.

**CURRENCY**. In administering this Policy:
1. all Predisability Income will be expressed in U.S. dollars; and
2. all premium and benefit amounts must be paid in U.S. dollars.

**WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE**. This Policy does not replace or provide benefits required by:
1. Workers' Compensation laws; or
2. any state disability insurance plan laws.

**ASSIGNMENT**. The rights and benefits under this Policy may not be assigned.

GL3001-LTD-7 04

01/01/15

## CLAIMS PROCEDURES

**NOTICE OF CLAIM.**  Written notice of a Disability claim must be given:
1.  within 20 days after the Injury or Sickness causing Disability begins; or
2.  as soon as reasonably possible after that.

The notice must be sent to the Company's Group Insurance Service Office.  It should include the Insured Employee's name and address and the number of this Policy.

**CLAIM FORMS.**  When notice of claim is received, the Company will send claim forms to the Insured Employee.  If the Company does not send the forms within 15 days, the Insured Employee may send the Company written proof of Disability in a letter.  It should state the date the Disability began, its cause and degree.  The Company will periodically send the Insured Employee additional claim forms.

**PROOF OF CLAIM.**  The Company must be given written proof of claim within 90 days after the end of the Elimination Period.  When it is not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason, if the proof is filed:
1.  as soon as reasonably possible; and
2.  in no event later than one year after it was required.

These time limits will not apply while an Insured Employee lacks legal capacity.

Proof of claim must be provided at the Insured Employee's own expense.  It must show the date the Disability began, its cause and degree. Documentation must include:
1.  completed statements by the Insured Employee and the Employer;
2.  a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her Regular Occupation;
3.  proof of any other income received;
4.  proof of any benefits available from other income sources, which may affect Policy benefits;
5.  a signed authorization for the Company to obtain more information; and
6.  any other items the Company may reasonably require in support of the claim.

Proof of continued Disability, Regular Care of a Physician, and any Other Income Benefits affecting the claim must be given to the Company.  This must be supplied within 45 days after the Company requests it.  If it is not, benefits may be denied or suspended.

**EXAMINATION.**  The Company may have the Insured Employee examined:
1.  by a Physician, specialist or vocational rehabilitation expert of the Company's choice;
2.  as often as reasonably required while a claim or appeal is pending.

Any such exam will be at the Company's expense.

The Company may determine that (in its opinion) the Insured Employee has:
1.  failed to cooperate with an examiner;
2.  failed to take an exam scheduled by the Company; or
3.  postponed such an exam more than twice.

In that event, benefits may be denied or suspended, until the required exam is completed.

**TIME OF PAYMENT OF CLAIMS.**  Benefits payable under this Policy will be paid immediately after the Company receives complete proof of claim and confirms liability.  After that:
1.  Any benefits will be paid monthly, during any period for which the Company is liable.  If benefits are due for less than a month, they will be paid on a pro rata basis.  The daily rate will equal 1/30 of the Monthly Benefit.
2.  Any balance, which remains unpaid at the end of the period of liability, will be paid immediately after the Company receives complete proof of claim and confirms liability.

GL3001-LTD-8 04 TN

## CLAIMS PROCEDURES
### (Continued)

**TO WHOM PAYABLE.**  All benefits are payable to the Insured Employee, while living.  After his or her death, benefits will be payable as follows.
1.   Any Survivor Benefit will be payable in accord with that section.
2.   Any other benefits will be payable to the Insured Employee's estate.

If a benefit becomes payable to:
1.   the Insured Employee's estate; or
2.   a minor or any other person who is not legally competent to give a valid receipt;
then up to $1,000 may be paid to any relative of the Insured Employee that the Company finds entitled to payment.  If payment is made in good faith to such a relative, the Company will not have to pay that benefit again.

**NOTICE OF CLAIM DECISION.**  The Company will send the Insured Employee a written notice of its claim decision.  If the Company denies any part of the claim, the written notice will explain:
1.   the reason for the denial, under the terms of this Policy and any internal guidelines;
2.   how the Insured Employee may request a review of the Company's decision; and
3.   whether more information is needed to support the claim.
This notice will be sent within 15 days after the Company resolves the claim.  It will be sent within 45 days after the Company receives the first proof of claim, if reasonably possible.

**Delay Notice.**  The Company may need more than 15 days to process the claim, due to matters beyond its control.  If so, an extension will be permitted.  In that event, the Company will send the Insured Employee a written delay notice:
1.   by the 15th day after receiving the first proof of claim; and
2.   every 30 days after that, until the claim is resolved.

The notice will explain:
1.   what additional information is needed to determine liability; and
2.   when a decision can be expected.
If the Insured Employee does not receive a written decision by the 105th day after the Company receives the first proof of claim, there is a right to an immediate review, as if the claim was denied.

**Exception:**  The Company may need more information from the Insured Employee to process a claim.  If so, it must be supplied within 45 days after the Company requests it.  The resulting delay will not count towards the above time limits for claim processing.

**REVIEW PROCEDURE.**  Within 180 days after receiving a denial notice, the Insured Employee may request a claim review by sending the Company:
1.   a written request; and
2.   any written comments or other items to support the claim.
The Insured Employee may review certain non-privileged information relating to the request for review.

The Company will review the claim and send the Insured Employee a written notice of its decision.  The notice will state the reasons for the Company's decision, under the terms of this Policy and any internal guidelines.  If the Company upholds the denial of all or part of the claim, the notice will also describe:
1.   any further appeal procedures available under this Policy;
2.   the right to access relevant claim information; and
3.   the right to request a state insurance department review, or to bring legal action.
This notice will be sent within 45 days after the Company receives the request for review, or within 90 days if a special case requires more time.

GL3001-LTD-8 04 TN

## CLAIMS PROCEDURES
### (Continued)

**Delay Notice.**  If the Company needs more than 45 days to process an appeal, in a special case:
1.  an extension of up to 45 more days will be permitted; and
2.  the Company will send the Insured Employee a written delay notice, by the 30th day after receiving the request for review.

The notice will explain:
1.  the special circumstances which require the delay;
2.  whether more information is needed to review the claim; and
3.  when a decision can be expected.

**Exception:**  The Company may need more information from the Insured Employee to process an appeal.  If so, it must be supplied within 45 days after the Company requests it.  The resulting delay will not count towards the above time limits for appeal processing.

**Claims Subject to ERISA** (Employee Retirement Income Security Act of 1974).  Before bringing a civil legal action under the federal labor law known as ERISA, an employee benefit plan participant or beneficiary must exhaust available administrative remedies.  Under this Policy, the plan participant or beneficiary must first seek two administrative reviews of the adverse claim decision, in accord with this section.   After the required reviews:
1.  an ERISA plan participant or beneficiary may bring legal action under Section 502(a) of ERISA; and
2.  the Company will waive any right to assert that he or she failed to exhaust administrative remedies.

**SUBROGATION.**  To the extent permitted by Tennessee law, the Company shall have the right to recover any Policy benefits paid for a Disability:
1.  which is caused by a third party's wrongful act or negligence; and
2.  for which the Insured Employee recovers from the third party or the third party's insurer.
The third party may be another person or an organization.

The Company may only recover judgment, award or settlement amounts that:
1.  are specifically designated to be for the Insured Employee's lost income due to that Disability; and
2.  would fully compensate the Insured Employee for such lost income, in the absence of Policy benefits.

If a Disability appears to be someone else's fault or liability, Policy benefits will be paid for that Disability only if the Insured Employee agrees:
1.  to repay the Company for such benefits, to the extent that they are for lost income for which the Insured Employee recovers full damages from the third party; and
2.  to execute any legal instruments the Company needs to secure the above rights.

If the Company pays such Policy benefits, then, to the extent permitted by Tennessee law, the Company will be subrogated to the Insured Employee's rights of recovery against the third party who is at fault or liable.  The Insured Employee is required:
1.  to actively pursue recovery; and
2.  to cooperate in the Company's pursuit of recovery.
If he or she does not, Policy benefits may be denied or suspended.

These rights extend only to recovery of Policy benefits paid for the same or related Disability.  The amount of the repayment may be reduced by:
1.  any amount that would be needed to fully compensate the Insured Employee for lost income due to the Disability, in the absence of Policy benefits; and
2.  reasonable expenses the Insured Employee incurs in recovering from the person at fault.

GL3001-LTD-8 04 TN

01/01/15

## CLAIMS PROCEDURES
### (Continued)

If recovery is made before Policy benefits are paid, the Company's liability under this Policy for that Disability shall be reduced accordingly.  If recovery is made after Policy coverage ends, the Insured Employee must still repay the Company as described above.

**THIRD PARTY REIMBURSEMENT.**   To the extent permitted by Tennessee law, the Insured Employee may be entitled to payment or reimbursement from some other person or organization, through a legal action or claim.  It must be caused by the same or related Disability for which Policy benefits are payable.  If the Insured Employee is made whole for lost income due to such Disability, then the Company will have the right to share any remaining recovery from that person or organization, whether such recovery is by judgment, settlement or otherwise.  The amount of the Company's share will not exceed:

1. the amount actually recovered and specifically designated to be for lost income due to such Disability; less:
    a. any amount that would be needed to fully compensate the Insured Employee for such lost income, in the absence of Policy benefits; and
    b. reasonable legal fees and expenses the Insured Employee paid to pursue the recovery; or
2. the total amount of Policy benefits paid for the Disability (whichever is less).

If an Insured Employee is entitled to such payment or reimbursement, he or she is required to actively pursue it.  If he or she does not, Policy benefits may be denied or suspended.  The Insured Employee must take no action to prejudice the Company's right of reimbursement.  He or she must:

1. execute any legal instruments; and
2. furnish any information the Company may reasonably require.

**RIGHT OF RECOVERY.**  If benefits have been overpaid on any short-term disability or long-term disability claim, full reimbursement to the Company is required within 60 days.  If reimbursement is not made, the Company has the right to:

1. reduce future benefits and suspend payment of the Minimum Monthly Benefit under this Policy, until full reimbursement is made;
2. reduce benefits payable to the Insured Employee or his or her beneficiary under any group insurance policy issued by the Company, until full reimbursement is made; or
3. recover such overpayments from the Insured Employee or his or her estate.

Such reimbursement is required whether the overpayment is due to:

1. the Company's error in processing a claim;
2. the Insured Employee's receipt of Other Income Benefits;
3. fraud, misrepresentation or omission of relevant facts; or
4. any other reason.

However, if the overpayment is due solely to the Company's error in processing the claim; then this right of recovery will be limited to overpayments made within the 15 months prior to the Company's discovery of the error and request for reimbursement.

**LEGAL ACTIONS.**  No legal action to recover any benefits may be brought until 60 days after the required written proof of claim has been given.  No such legal action may be brought more than five years after the date written proof of claim is required.

**COMPANY'S DISCRETIONARY AUTHORITY.**  Except for the functions that this Policy clearly reserves to the Policyholder or Employer, the Company has the authority to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it.  The Company's authority includes (but is not limited to) the right to:

1. establish administrative procedures, determine eligibility and resolve claims questions;
2. determine what information the Company reasonably requires to make such decisions; and
3. resolve all matters when an internal claim review is requested.

The Insured Employee has the right to request a state insurance department review or to bring legal action.
This provision does not apply to residents of California.

GL3001-LTD-8 04 TN

## ELIGIBILITY

**ELIGIBLE CLASSES.**   The classes of Employees eligible for insurance are shown in the Schedule of Benefits.  The Company has the right to review and terminate any or all classes eligible under this Policy, if any class ceases to be covered by this Policy.

**ELIGIBILITY DATE.**  An Employee becomes eligible for coverage provided by this Policy on the later of:
1.   this Policy's date of issue; or
2.   the date the Waiting Period is completed.

**Prior Service Credit Towards Waiting Period.**   The Waiting Period is shown in the Schedule of Benefits. Prior service in an Eligible Class will apply toward the Waiting Period, when:
1.   a former Employee is rehired within one year after his or her employment ends; or
2.   an Employee returns from an approved Family or Medical Leave within:
    a.   the 12-week leave period required by federal law; or
    b.   any longer period required by a similar state law; or
3.   an Employee returns from a Military Leave within the period required by federal USERRA law.

**EXCEPTION.**  If a person is working as an ineligible employee for the Employer and then becomes a regular Full-Time Employee of the Employer, any time incurred with the Employer as an ineligible Employee will be applied toward the Waiting Period.

## EFFECTIVE DATES

**EFFECTIVE DATE.**   An Employee's initial amount of coverage becomes effective at 12:01 a.m. on the latest of:
1.   the first day of the Insurance Month following the date the Employee becomes eligible for the coverage;
2.   the date the Employee resumes Active Work, if not Actively at Work on the day he or she becomes eligible;
3.   the date the Employee makes written application for coverage and signs;
    a.   a payroll deduction order, if the Employees pay any part of the Policy premium; or
    b.   an order to pay premiums from the Employee's Flexible Benefits Plan account, if premiums are paid through such an account; or
4.   the date the Company approves the Employee's Evidence of Insurability, if required.

Any increased or additional coverage becomes effective at 12:01 a.m. on the latest of:
1.   the first day of the Insurance Month coinciding with or next following the date on which the Insured Employee becomes eligible for the increase, if Actively at Work on that day;
2.   the date the Insured Employee resumes Active Work, if not Actively at Work on the day the increase would otherwise take effect; or
3.   the date any required Evidence of Insurability is approved by the Company.

Any decrease will take effect on the day of the change, whether or not the Insured Employee is Actively at Work.

GL3001-LTD-9 04

01/01/15

## EFFECTIVE DATES
### (Continued)

**EVIDENCE OF INSURABILITY.**  Evidence of Insurability satisfactory to the Company must be submitted (at the Employee's expense) when:

1. an Employee makes written application for coverage (or an increased amount of coverage) more than 31 days after becoming eligible for the coverage;
2. an Employee makes written application to enroll for coverage after he or she has requested:
   a.  to cancel insurance;
   b.  to stop payroll deductions for the insurance; or
   c.  to stop premium payments from the Flexible Benefits Plan account;
3. coverage is elected after the Employee has caused insurance to lapse, by failing to pay the required premium when due; or
4. optional, supplemental or voluntary coverage is elected in excess of any Guaranteed Issue Amounts shown in the Schedule of Benefits.

**EFFECTIVE DATE FOR CHANGE IN ELIGIBLE CLASS.**  An Insured Employee may become a member of a different Eligible Class.  Coverage under the different Eligible Class will be effective:

1. on the first day of the Insurance Month coinciding with or next following the date of the change;
2. except as stated in the Effective Date provision for increases or decreases.

**REINSTATEMENT RIGHTS.**  If an Insured Employee's coverage terminates due to one of the following breaks in service, he or she will be entitled to reinstate the coverage upon resuming Active Work with the Employer within the required timeframe.  **"Reinstatement"** or **"to reinstate"** means to re-enroll for Policy coverage, without satisfying a new Waiting Period or providing Evidence of Insurability.  Reinstatement is available upon:

1. return from an approved Family or Medical Leave within:
   a.  the 12-week period required by federal law; or
   b.  any longer period required by a similar state law;
2. return from a Military Leave within the period required by federal USERRA law;
3. return from any other approved leave of absence within six months after the leave begins;
4. return within 12 months following a lay off; or
5. return within 12 months following termination of employment for any other reason.

To reinstate coverage, the Employee must apply for coverage or be re-enrolled within 31 days after resuming Active Work in an Eligible Class. The reinstated amount of insurance may not exceed the amount that terminated. Reinstatement will take effect on the date the Insured Employee returns to Active Work.

If the above conditions are met, then:

1. the months of leave will count towards any unmet Pre-Existing Condition Exclusion period; and
2. a new Pre-Existing Condition Exclusion will not apply to the reinstated amount of insurance.

A new Pre-Existing Condition Exclusion will apply to any increased amount of insurance.

## INDIVIDUAL TERMINATION

**INDIVIDUAL TERMINATION OF COVERAGE.** An Insured Employee's coverage will terminate at 12:00 midnight on the earliest of:

1. the date this Policy or the Employer's participation terminates; (but without prejudice to any claim incurred prior to termination);
2. the date the Insured Employee's Class is no longer eligible for insurance;
3. the date such Insured Employee ceases to be a member of an Eligible Class;
4. the last day of the Insurance Month in which the Insured Employee requests termination;
5. the last day of the last Insurance Month for which premium payment is made on the Insured Employee's behalf;
6. the end of the period for which the last required premium has been paid;
7. with respect to a particular insurance benefit, the date the portion of this Policy providing that benefit terminates;
8. the date on which the Insured Employee's employment with the Employer terminates; unless coverage is continued as provided below; or
9. the date the Insured Employee enters the armed services of any state or country on active duty, except for duty of 30 days or less for training in the Reserves or National Guard. (If the Insured Employee sends proof of military service, the Company will refund any unearned premium.)

**CONTINUATION RIGHTS.** Ceasing Active Work results in termination of the Insured Employee's eligibility for insurance, but coverage may be continued as follows.

1. **Disability.** If an Insured Employee is absent due to Total Disability, or is engaged in Partial Disability Employment, coverage may be continued during:
   a. the Elimination Period; provided the Company receives the required premium from the Employer; and
   b. the period for which benefits are payable, without payment of premium.
   Premium payments will be waived from the satisfaction of the Elimination Period until the end of the period for which benefits are payable. If coverage is to be continued following a period for which premiums were waived, premium payments must be resumed, as they become due.

2. **Family or Medical Leave.** If an Insured Employee goes on an approved Family or Medical Leave, and is **not** entitled to the more favorable continuation available during Disability, coverage may be continued, until the earliest of:
   a. the end of the leave period approved by the Employer;
   b. the end of the 12-week leave period required by federal law, or any more favorable period required by a similar state law;
   c. the date the Insured Employee notifies the Employer that he or she will not return; or
   d. the date the Insured Employee begins employment with another employer.
   The required premium payments must be received from the Employer, throughout the period of continued coverage.

3. **Military Leave.** If an Insured Employee goes on a Military Leave, coverage may be continued for the same period allowed for an approved Family or Medical Leave. The required premium payments must be received from the Employer, throughout the period of continued coverage.

4. **Lay-off or Other Leave.** When an Insured Employee ceases work due to a temporary lay-off, or due to an approved leave of absence (other than an approved Family or Medical Leave or a Military Leave); coverage may be continued for three Insurance Months after the lay-off or leave begins. The required premium payments must be received from the Employer, throughout the period of continued coverage.

GL3001-LTD-10 04

01/01/15

**EXHIBIT 1, page 21**

## INDIVIDUAL TERMINATION
### (Continued)

**Conditions.** In administering the above continuation(s), the Employer must not act so as to discriminate unfairly among Employees in similar situations. Insurance may **not** be continued when an Insured Employee ceases Active Work due to a labor dispute, strike, work slowdown or lockout.

**INDIVIDUAL TERMINATION DURING DISABILITY.** Termination of an Insured Employee's coverage during a Disability will have no effect on benefits payable for that period of Disability.

## POLICY TERMINATION

**POLICY TERMINATION BY THE COMPANY.** To terminate this Policy, the Company must give the Group Policyholder at least 31 days advance written notice of its intent to do so. The Company may terminate this Policy on the due date of any premium if:
1. the number of Insured Employees totals less than 10;
2. part of the premium is paid by the Insured Employee and less than 75% of those eligible for coverage are insured;
3. all of the premium is paid by the Policyholder and less than 100% of those eligible for coverage are insured;
4. the Policyholder, without good cause, fails to:
   a. promptly furnish any information which the Company may reasonably require;
   b. perform its duties pertaining to this Policy in good faith;
5. the Employer ceases to be covered under the state Workers' Compensation program or any other program of like intent.
6. the Company terminates all other policies where permitted by their terms, which provide long-term disability benefits in the same state in which this Policy was issued; or
7. state law otherwise requires this Policy to be terminated.

**POLICY TERMINATION BY THE POLICYHOLDER.** The Policyholder may terminate this Policy at any time by giving the Company advance written notice. This Policy will then terminate on:
1. the date the Company receives the notice; or
2. some later date on which the Policyholder and the Company have agreed.

However, termination will not become effective during any period for which premium has been paid to the Company. The Policyholder remains liable for the payment of premiums to the date of termination.

**AUTOMATIC POLICY TERMINATION.** If any premium is not paid before the end of the Grace Period; then this Policy will terminate at the end of the Grace Period, without any action on the Company's part. The Policyholder remains liable for the payment of premiums to the date of termination.

**POLICY TERMINATION DURING DISABILITY.** Termination of this Policy or an Employer's participation during a Disability shall have no effect on benefits payable to the Insured Employee for that period of Disability.

GL3001-LTD-10 04

01/01/15

**EXHIBIT 1, page 22**

## PREMIUMS AND PREMIUM RATES

**PAYMENT OF PREMIUM.**  No coverage provided by this Policy will be in effect until the first premium for such coverage is paid.  For coverage to remain in effect, the Employer must pay each subsequent premium on or before its due date at the Company's Group Insurance Service Office.  The premium must be paid in U.S. dollars.

**PREMIUM RATES.**  The initial premium rates for this Policy are shown on the Face Page of this Policy. Premium rates are subject to change.

**PREMIUM RATE CHANGE.**  The Company may change any premium rate on any of the following dates:
1.  the date this Policy's terms are changed;
2.  the date the Company's liability is changed due to a change in federal, state or local law;
3.  the date the Company's liability is changed because the Policyholder (or any covered division, subsidiary or affiliated company):
    a.  relocates, dissolves or merges, or is added to or removed from this Policy; or
    b.  ceases to be covered by the state Workers' Compensation program or any other program of like intent; or
    c.  ceases to provide or reduces Sick Leave or Salary Continuance Plan benefits;
4.  the date any coverage for one or more classes ceases to be provided under this Policy;
5.  the date the number of Insured Employees changes by 25% or more from the enrollment on the date this Policy took effect, or the most recent Rate Guarantee Date expired, if later;
6.  on any premium due date on or after this Policy's first anniversary, or any later rate guarantee date agreed upon by the Company.

Unless the Company and the Policyholder agree otherwise, the Company will give at least 31 days' advance written notice of any increase in premium rates.

**MONTHLY PREMIUM AMOUNT.**  The amount of monthly premium due on each due date will be the Total Covered Payroll multiplied by the premium rate.  Changes will not be pro-rated daily.  Instead, premium will be adjusted as follows.
1.  When an Insured Employee's insurance (or increased amount of insurance) takes effect, premium will be charged from the monthly due date coinciding with or next following that change.
2.  When all or part of an Insured Employee's insurance terminates, the applicable premium will cease on the monthly due date coinciding with or next following that termination.
3.  When premiums are paid other than monthly, increases or decreases will result in an adjustment from the premium due date coinciding with or next following that change.
The above manner of charging premium is for accounting purposes only.  It will not extend insurance coverage beyond a date it would have otherwise terminated.

Each premium payment will include any adjustments in past premiums, which are needed due to changes that have not yet been taken into account.  If a premium adjustment involves a return of unearned premium, the amount of the return will be limited to the prior 12-month period.

**GRACE PERIOD.**  A Grace Period of 31 days from the due date will be allowed for the payment of each premium after the first.  This Policy will remain in effect during the Grace Period.  The Policyholder will be liable to the Company for the payment of all premiums due for the period this Policy remains in effect, however.

**WAIVER OF PREMIUM.**  Premium will be administered as follows during any period for which benefits are payable.
1.  Premium payments are waived for an Insured Employee who is Disabled:
    a.  from the first premium due date following the satisfaction of the Elimination Period;
    b.  until the end of any period for which benefits are payable.
2.  If coverage is to be continued following a period during which premiums were waived, premium payments must be resumed as they become due.

GL3001-LTD-11 04

01/01/15

**EXHIBIT 1, page 23**

## TOTAL DISABILITY MONTHLY BENEFIT

**BENEFIT**.  The Company will pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period, if he or she:
1.  is Totally Disabled;
2.  becomes Disabled while insured for this benefit;
3.  is under the Regular Care of a Physician; and
4.  at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request.

The Total Disability Monthly Benefit will cease on the earliest of:
1.  the date the Insured Employee ceases to be Totally Disabled or dies;
2.  the date the Maximum Benefit Period ends; or
3.  the date the Insured Employee is able, but chooses not to engage in Partial Disability Employment:
    a.    in his or her Own Occupation, during the Own Occupation Period; or
    b.    in any Gainful Occupation, after the Own Occupation Period.

Proportional benefits will be paid for a partial month of Total Disability.

At the Company's option, Total Disability Monthly Benefit payments may also be denied or suspended on any of the following dates:
1.  the date the Insured Employee (without good cause):
    a.    fails to take a required medical exam;
    b.    fails to cooperate with the examiner; or
    c.    postpones a required exam more than twice;
2.  the 45th day after the Company mails a request for additional proof, if not given;
3.  the 45th day after the Company mails a request for proof of the Insured Employee's application for any Other Income Benefits to which he or she may be entitled, if not given; or
4.  the date the Insured Employee (without good cause) refuses to participate in good faith in a vocational rehabilitation program approved by the Company; if this Policy includes a Mandatory Vocational Rehabilitation Benefit provision.

**AMOUNT.**  The amount of the Total Disability Monthly Benefit equals:
1.  the Insured Employee's Basic Monthly Earnings multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
2.  Other Income Benefits.

The amount of the Total Disability Monthly Benefit will not be less than the Minimum Monthly Benefit, unless the Minimum Monthly Benefit plus Other Income Benefits would exceed 100% of the Insured Employee's Basic Monthly Earnings.

The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit, and Maximum Benefit Period are shown in the Schedule of Benefits.

Any Gainful Occ, Standard Integ.

GL3001-LTD-12 10

01/01/15

## PROGRESSIVE INCOME BENEFIT

**EFFECTIVE DATE.** An Insured Employee will become insured for the Progressive Income Benefit on:
1. the effective date of his or her coverage for Long Term Disability Benefits under this Policy; or
2. the effective date of this provision, if it is added later by amending this Policy.

**Exception:** The effective date will be delayed for an Insured Employee who is unable to perform one or more Activities of Daily Living or suffers from a Cognitive Impairment on that date. In that event, the Insured Employee will become insured for this benefit on the first day he or she:
1. is able to safely and completely perform all of the Activities of Daily Living without another person's active, hands-on help; or
2. no longer suffers from a Cognitive Impairment.

**BENEFIT.** After completion of the Elimination Period shown in the Schedule of Insurance, the Company will pay an additional monthly benefit to an Insured Employee; if he or she:
1. is receiving Total Disability or Partial Disability Monthly Benefits under this Policy; and
2. submits proof of suffering the Loss of Activities of Daily Living or a Cognitive Impairment (as defined below).
Proof must be submitted at the Insured Employee's own expense.

**AMOUNT.** The amount of the Progressive Income Benefit:
1. will equal 10% of the Insured Employee's Basic Monthly Earnings; but
2. will not exceed the Maximum Monthly Benefit for Long Term Disability Benefits, or $5,000 per month (whichever is less).
The Maximum Monthly Benefit for Long Term Disability Benefits is shown in the Schedule of Insurance. The Progressive Income Benefit will not be reduced by any Other Income Benefits, or by earnings from any form of employment.

**DURATION.** This Progressive Income Benefit will cease on the earliest of:
1. the date the Insured Employee no longer suffers from the Loss of Activities of Daily Living or Cognitive Impairment (as defined below);
2. the date the Insured Employee is no longer entitled to Total Disability or Partial Disability Monthly Benefits under this Policy;
3. the date the Maximum Benefit Period ends; or
4. the date the Insured Employee dies.
If this Policy includes a Family Income Benefit, the amount paid to the Eligible Surviving Spouse or Children will not increase due to the Insured Employee's receipt of this Progressive Income Benefit.

## DEFINITIONS

**"Loss of Activities of Daily Living"** means that, due to an Injury or Sickness, the Insured Employee has lost the ability to safely and completely perform **two or more** of the following six Activities of Daily Living without another person's active, hands-on help with all or most of the activity.

The six Activities of Daily Living are:
1. **Bathing** - washing self in a tub, in a shower or by sponge bath; with or without equipment.
2. **Dressing** - putting on, taking off, fastening or unfastening garments, any medically necessary braces, or any artificial limbs normally worn.
3. **Toileting** - getting to, from, on and off toilet and performing related personal hygiene.
4. **Transferring** - moving in and out of bed, chair or any wheelchair; with or without equipment such as canes, walkers, crutches, grab bars, other support devices, or mechanical or motorized devices.
5. **Continence** - voluntarily maintaining control of bladder and bowel function; or performing related personal hygiene, including care of any catheter or colostomy bag, if not continent.
6. **Eating** - once food is prepared and made available, getting nourishment into one's body by any means. This includes eating from a table, tray or container (such as a bowl or cup); or using special equipment (such as a feeding tube or intravenous tube).

GL3001-LTD-12D 01

ADL Benefit
01/01/15

## PROGRESSIVE INCOME BENEFIT
### (Continued)

**"Cognitive Impairment"** means that due to an Injury or Sickness, the Insured Employee:
1. has suffered a permanent deterioration or loss of cognitive or intellectual capacity; and
2. requires another person's active, hands-on help or verbal cues to prevent harm to self or others, due to that impairment.

The impairment must be diagnosed by a Physician, based upon clinical evidence and reliable standardized tests of short or long-term memory; orientation as to person, place and time; and deductive or abstract reasoning. It may result from moderate to severe head trauma, stroke, Alzheimer's disease or other form of irreversible dementia.

**"Mental Sickness,"** as used in this provision, means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause. It includes, but is not limited to:
1. schizophrenia or schizoaffective disorder;
2. bipolar affective disorder, manic depression, or other psychosis; and
3. obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider. Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Mental Sickness does **not** include irreversible dementia resulting from stroke; trauma; viral infection; Alzheimer's disease; or other conditions which are not usually treated by a mental health care provider using psychotherapy, psychotropic drugs, or similar methods of treatment.

**"Pre-Existing Condition,"** as used in this provision, means a Sickness or Injury for which the Insured Employee received treatment within 3 months prior to his or her effective date for this benefit. Treatment includes a Physician's consultation, care and services; diagnostic measures; and the prescription, refill or taking of prescribed drugs or medicines.

## EXCLUSIONS AND LIMITATIONS

**Prior Disability.** This benefit will not be payable during a period of Disability which begins before the Insured Employee's effective date of coverage under this benefit.

**Pre-Existing Conditions.** This benefit will not be payable for a Loss of Activities of Daily Living or Cognitive Impairment:
1. which is caused or contributed to by, or results from a Pre-Existing Condition (as defined above); and
2. which begins in the first 12 months after the Insured Employee's effective date under this benefit.

**Mental Sickness and Substance Abuse.** This benefit will not be payable during a period of Disability which is caused or contributed to by or results from a Mental Sickness, alcoholism, or voluntary use of a Controlled Substance; unless prescribed by a Physician. Controlled Substances are those defined as such in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, and any amendments to it.

**Other Provisions.** This benefit will be subject to all of the Definitions, Exclusions, Proof of Claim, Waiver of Premium and other provisions of this Policy.

## PARTIAL DISABILITY MONTHLY BENEFIT

**BENEFIT**.  The Company will pay a Partial Disability Monthly Benefit to an Insured Employee, after completion of the Elimination Period, if he or she:
1. is Disabled;
2. becomes Disabled while insured for this benefit;
3. is engaged in Partial Disability Employment;
4. is earning at least 20% of Predisability Income when Partial Disability Employment begins;
5. is under the Regular Care of a Physician; and
6. at his or her own expense, submits proof of continued Partial Disability, Physician's care and reduced earnings to the Company upon request.

The Insured Employee does not have to be Totally Disabled prior to receiving Partial Disability Monthly Benefits.  The Elimination Period may be satisfied by days of Total Disability, Partial Disability or any combination of these.

The Partial Disability Monthly Benefit will cease on the earliest of:
1. the date the Insured Employee ceases to be Partially Disabled or dies;
2. the date the Maximum Benefit Period ends;
3. the date the Insured Employee earns more than:
   a. 99% of Predisability Income, until Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability; or
   b. 60% of Predisability Income, after Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability;
4. the date the Insured Employee is able, but chooses not to work full-time:
   a. in his or her Own Occupation, during the Own Occupation Period; or
   b. in any Gainful Occupation, after the Own Occupation Period.

Proportional benefits will be paid for a partial month of Partial Disability.

At the Company's option, Partial Disability Monthly Benefit payments may also be denied or suspended on any of the following dates:
1. the date the Insured Employee (without good cause):
   a. fails to take a required medical exam;
   b. fails to cooperate with the examiner; or
   c. postpones a required exam more than twice;
2. the 45th day after the Company mails a request for additional proof, if not given;
3. the 45th day after the Company mails a request for proof of the Insured Employee's application for any Other Income Benefits to which he or she may be entitled, if not given; or
4. the date the Insured Employee (without good cause) refuses to participate in good faith in a vocational rehabilitation program approved by the Company; if this Policy includes a Mandatory Vocational Rehabilitation Benefit provision.

Any Gainful Occ Def. Res

## PARTIAL DISABILITY MONTHLY BENEFIT
### (Continued)

BENEFIT AMOUNT.  The Partial Disability Monthly Benefit will replace the Insured Employee's Lost Earning Capacity; provided it does not exceed the Total Disability Monthly Benefit, which would otherwise be payable during Total Disability without the Partial Disability Employment.

Thus, the amount of the Partial Disability Monthly Benefit will equal the lesser of A or B below.

A.   LOST EARNING CAPACITY:  The Insured Employee's Predisability Income, minus all Other Income Benefits (including earnings and potential earnings from Partial Disability Employment).

B.   TOTAL DISABILITY MONTHLY BENEFIT otherwise payable:
1.   The Insured Employee's Predisability Income multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
2.   Other Income Benefits, except for earnings and potential earnings from Partial Disability Employment.

The Partial Disability Monthly Benefit will never be less than the Minimum Monthly Benefit.  The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit, and Maximum Benefit Period are shown in the Schedule of Benefits.

FULL EARNING CAPACITY.  Potential earnings from Partial Disability Employment will be estimated by the Company, when the Insured Employee is able to increase his or her earnings:
1.   during the Own Occupation Period, by increasing the number of hours worked or duties performed in his or her regular occupation, but chooses not to do so; or
2.   after the Own Occupation Period, by increasing the number of hours worked or duties performed in any Gainful Occupation, but chooses not to do so.

Such potential earnings will reduce the Partial Disability Monthly Benefit amount payable, while the Insured Employee is not working to his or her full earning capacity.  Gainful Occupation will be defined as shown in the Total Disability Monthly Benefit section.

Progressive Calculation, Full Capacity

## OTHER INCOME BENEFITS

**OTHER INCOME BENEFITS** means benefits, awards, settlements or Earnings from the following sources. These amounts will be offset, in determining the amount of the Insured Employee's Monthly Benefit. Except for Retirement Benefits and Earnings, these amounts must result from the same Disability for which a Monthly Benefit is payable under this Policy.

**Workers' Compensation.**   Any benefits for which the Insured Employee is eligible under a law that compensates for job related Injury or Sickness.  This includes:
1.   any Workers' Compensation or occupational disease law;
2.   the Jones Act;
3.   the Longshoreman's and Harbor Worker's Act;
4.   the Maritime Doctrine of Maintenance, Wages or Cure; or
5.   any plan provided in place of one of the above plans.
It includes any benefits for partial or total disability, whether temporary or permanent.  It also includes any benefits for vocational rehabilitation.

**Other Compulsory Benefits.**   Any disability income benefits the Insured Employee is eligible to receive under any other compulsory benefit act or law.  This includes (but is not limited to):
1.   state temporary disability income benefit laws;
2.   state no fault auto insurance laws; or
3.   any other compulsory benefit act or law.

**Other Insurance Plans.**   Any disability income benefits for which the Insured Employee is eligible under:
1.   any other group insurance plan (except credit or mortgage insurance) provided by the Employer;
2.   any no fault auto plan; or
3.   any auto liability insurance policy.

**Employee Benefit Plans.**   Any disability income benefits for which the Insured Employee is eligible under the Employer's Sick Leave or Salary Continuance Plan.  This does **not** include vacation pay, severance pay or pay for work actually performed during a Disability.

**Employer's Retirement Plan.**   Any Disability Benefits or Retirement Benefits the Insured Employee receives under the Employer's Retirement Plan.

**Social Security and other Government Retirement Plans.**   The following Social Security or other Government Retirement Plan benefits will be offset:
1.   **disability benefits** for which the Insured Employee is eligible; and for which any spouse or child is eligible, because of the Insured Employee's Disability;
2.   **unreduced retirement benefits** for which the Insured Employee is eligible; and for which any spouse or child is eligible, because of the Insured Employee's eligibility for unreduced retirement benefits; or
3.   **reduced retirement benefits** actually received by the Insured Employee; and by any spouse or child, because of the Insured Employee's receipt of reduced retirement benefits.

As used above, **"Government Retirement Plans"** include disability and retirement benefits under:
1.   the federal Social Security Act, Jones Act or Railroad Retirement Act;
2.   the Canada Pension Plan or Quebec Pension Plan;
3.   any similar plan or act of any country, state, province or other political unit; or
4.   any plan provided in place of one of the above plans.

Any Gainful Occ, Prim & Fam SS

## OTHER INCOME BENEFITS
### (Continued)

**"Earnings"**, as used in this provision, means pay the Insured Employee earns or receives from any occupation or form of employment, as reported for federal income tax purposes. Earnings include (but are not limited to) a:

1. salaried or hourly Employee's gross earnings (shown on Form W-2); including:
   a. wages, tips, commissions, bonuses and overtime pay; and
   b. any pre-tax contributions to a Section 125 Plan, flexible spending account, or qualified deferred compensation plan;
2. proprietor's net profit (figured from Form 1040, Schedule C);
3. professional corporation shareholder's net profit (figured from Form 1040, Schedule C);
4. partner's net earnings from self-employment (shown on Schedule K-1) and any W-2 earnings; and
5. Subchapter S Corporation shareholder's net earnings from trade or business activities (shown on Schedule K-1).

**Recovery from Third Party.** Any amount the Insured Employee recovers from a third party as a result of the Disability and which is specified to be for loss of time or loss of wages (whether by judgment, settlement or otherwise). The offset:

1. will be reduced by attorney fees and other reasonable costs of recovery; and
2. will not exceed 100% of the net settlement.

**Exceptions.** The following will **not** be considered Other Income Benefits, and will not be offset in determining the Monthly Benefit:

1. a cost-of-living increase in any Other Income Benefit (except Earnings); if it takes effect after the first offset for that benefit during a period of Disability;
2. reimbursement for hospital, medical or surgical expense;
3. reimbursement for attorney fees and other reasonable costs of claiming Other Income Benefits;
4. group credit or mortgage disability insurance benefits;
5. early retirement benefits that are not elected or received under the federal Social Security Act or other Government Retirement Plan;
6. any amounts under the Employer's Retirement Plan that:
   a. represent the Insured Employee's contributions; or
   b. are received upon termination of employment without being disabled or retired;
7. benefits from a 401(k), profit-sharing or thrift plan; an individual retirement account (IRA); a tax sheltered annuity (TSA); a stock ownership plan; or a non-qualified plan of deferred compensation;
8. vacation pay, holiday pay, or severance pay; or
9. disability income benefits under any individual policy, association group plan or franchise plan.

**RULES FOR OTHER INCOME BENEFIT OFFSETS.** If the Insured Employee may be entitled to Other Income Benefits that affect Policy benefits, the following rules will apply.

**Claiming Other Income Benefits.** When there is a reasonable expectation that an Insured Employee may be entitled to some Other Income Benefit, he or she is required to actively pursue it. For example, if benefits may be payable under the federal Social Security Act, the Insured Employee:

1. must apply for such benefits on a timely basis;
2. must file a request for reconsideration, if benefits are denied; and
3. must request a hearing before an Administrative Law Judge, if denied again (unless the Company waives this in writing).

## OTHER INCOME BENEFITS
### (Continued)

An Employer whose Insured Employee may be entitled to Workers' Compensation or similar benefits is also required to cooperate in filing that claim. If the Insured Employee fails to pursue Other Income Benefits on a timely basis, the Company has the option to:
1. deny or suspend Monthly Benefits; or
2. reduce Monthly Benefits by an estimated amount.

**Estimating Offsets.** While a claim for Social Security or other Government Retirement Plan benefits is pending, the Insured Employee must elect one of the following options in writing. (If no written election is made, Monthly Benefits will be reduced in accord with Option 1.)

1. **Reduced Monthly Benefits.** The Insured Employee may receive Monthly Benefits reduced by estimated Social Security or other Government Retirement Plan benefits. The Company will adjust Policy benefits and will refund any underpayment, in a lump sum, upon receiving proof of:
   a. the amount actually awarded; or
   b. the claim denial and completion of any appeal the Company requires.

2. **Unreduced Monthly Benefits.** The Insured Employee may receive unreduced Monthly Benefits while the claim is pending. He or she must agree in writing to promptly refund any overpayment that results, in a lump sum, upon receiving Social Security or other Government Retirement Plan benefits. If he or she does not promptly refund an overpayment:
   a. the Company will reduce or eliminate future payments; and
   b. the Minimum Monthly Benefit will not apply, until the amount is repaid.

**Lump Sum Payments.** Other Income Benefits that are paid in a lump sum will be pro rated as follows.
1. The lump sum will be pro rated on a monthly basis, over the time period for which it is given.
2. If no time period is stated, the Company will continue its estimated monthly offset for that benefit, until full amount is offset.
3. If no estimated monthly offset was being made for that benefit, the lump sum will be pro rated on a monthly basis over a reasonable time period. It will not exceed 60 months or the Maximum Benefit Period (whichever occurs first).

**Cost-of-Living Freeze.** After the first deduction for each of the Other Income Benefits (except Earnings), its amount will be frozen. The Monthly Benefit will not be further reduced due to any cost-of-living increases payable under these Other Income Benefits.

Any Gainful Occ, Prim & Fam SS

## RECURRENT DISABILITY

**"Recurrent Disability"** means a Disability caused by an Injury or Sickness that is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable. A Recurrent Disability will be treated as follows.

1.   **New Disability.** A Recurrent Disability will be treated as a new Disability, if the Recurrent Disability begins after the Insured Employee returns to his or her Own Occupation with the Employer:
     a.   on a full-time basis working at least the Minimum Number of Hours Per Week as shown in the Schedule of Benefits; and
     b.   for six consecutive months or more following the date the prior Disability benefits ended.
     A new Elimination Period must be completed before further Monthly Benefits become payable. A new Maximum Benefit Period will apply.

2.   **Prior Disability.** A Recurrent Disability will be treated as part of the prior Disability, if the Recurrent Disability begins after the Insured Employee returns to his or her Own Occupation with the Employer:
     a.   on a full-time basis working at least the Minimum Number of Hours Per Week as shown in the Schedule of Benefits; but
     b.   for less than six consecutive months following the date the prior Disability benefits ended.
     The completion of a new Elimination Period is not required before further Monthly Benefits become payable. The same Maximum Benefit Period will apply to the Recurrent Disability as to the prior Disability. The Predisability Income used in determining the prior Disability benefit will apply as well.

     In addition, a Recurrent Disability will be treated as a prior Disability if all of the subsequent events occur in less than six consecutive months following the date the prior Disability benefits end under this Policy:
     a.   a job opening is not available for the Insured Employee to return to work with the Employer;
     b.   the Insured Employee's coverage under this Policy terminates;
     c.   the former Employee returns to his or her Own Occupation with a new employer on a full-time basis working at least the Minimum Number of Hours Per Week as shown in the Schedule of Benefits;
     d.   benefits are not payable under any other group long-term disability plan; and
     e.   a Recurrent Disability begins.
     Benefits for the former Employee will be reinstated for the Recurrent Disability and the completion of a new Elimination Period will not be required before further Monthly Benefits become payable. The same Maximum Benefit Period, Exclusions, and Limitations will apply to the Recurrent Disability as to the prior Disability. The Predisability Income used in determining the prior Disability benefit will apply as well. Benefits reinstated under this provision are subject to this Policy's terms and conditions that were in effect at the time the prior Disability began.

To qualify for a Monthly Benefit, the Insured Employee or former Employee must earn less than the percentage of Predisability Income specified in the Partial Disability Monthly Benefit section. Monthly Benefit payments will be subject to all other terms of this Policy that applied to the prior Disability.

This Recurrent Disability provision will cease to apply to an Insured Employee or former Employee who becomes eligible for coverage under any other group long-term disability plan.

GL3001-LTD-15 04

01/01/15

## EXCLUSIONS

**GENERAL EXCLUSIONS.**  This Policy will not cover any period of Total or Partial Disability:
1.  due to war, declared or undeclared, or any act of war;
2.  due to intentionally self-inflicted injuries;
3.  due to active participation in a riot;
4.  due to the Insured Employee's committing of or the attempting to commit a felony or any type of assault or battery;
5.  during which the Insured Employee is incarcerated for the commission of a felony;
6.  during which the Insured Employee is not under the Regular Care of a Physician;
7.  during which the Insured Employee is not participating in good faith in a vocational rehabilitation program approved by the Company, without good cause; if this Policy includes a Mandatory Vocational Rehabilitation Benefit provision; or
8.  after the Insured Employee has resided outside the United States or Canada for more than 12 consecutive benefit months for purposes other than employment with the Employer.

**PRE-EXISTING CONDITION EXCLUSION.**  This Policy will not cover any Total or Partial Disability:
1.  which is caused or contributed to by, or results from a Pre-Existing Condition; and
2.  which begins in the first 12 months after the Insured Employee's Effective Date.

"Pre-Existing Condition" means a Sickness or Injury for which the Insured Employee received treatment within 3 months prior to the Insured Employee's Effective Date.

"Treatment" means consultation, care or services provided by a Physician.  It includes diagnostic measures and the prescription, refill of prescription, or taking of any prescribed drugs or medicines.

## SPECIFIED INJURIES OR SICKNESSES LIMITATION

LIMITATION.  If an Insured Employee is Disabled primarily due to one or more of the Specified Injuries or Sicknesses defined below; then Partial or Total Disability Monthly Benefits:
1.   will be payable subject to the terms of this Policy; but
2.   will be limited to 24 months for any one period of Disability; unless the Insured Employee is confined to a Hospital.

"Specified Injuries or Sicknesses" include any Chronic Fatigue Sickness, Environmental Sickness, Mental Sickness, Musculoskeletal/Connective Tissue Injury or Sickness, or Substance Abuse, as defined below.

CONDITIONS
1.   If the Insured Employee is confined in a Hospital at the end of the 24th month for which Policy benefits are paid for the Specified Injury or Sickness; then benefits will be payable until he or she is discharged from that facility.
2.   In no event will the Monthly Benefit be paid beyond the Maximum Benefit Period shown in the Schedule of Insurance, however.

DEFINITIONS

**"Chronic Fatigue Sickness"** means a sickness that is characterized by a debilitating fatigue, in the absence of other known medical or psychological conditions.  It includes, but is not limited to:
1.   chronic fatigue syndrome or chronic fatigue immunodeficiency syndrome;
2.   an Epstein-Barr or herpes 6 viral infection, or post viral syndrome; and
3.   limbic encephalopathy or myalgic encephalomyelitis.
It does **not** include depression or any neoplastic, neurologic, endocrine, hematologic or rheumatologic disorder.

**"Environmental Sickness"** means an allergy or sensitivity to chemicals or the environment.  It includes, but is not limited to:
1.   environmental allergies;
2.   sick building syndrome;
3   multiple chemical sensitivity syndrome; and
4.   chronic toxic encephalopathy.
It does **not** include asthma or allergy-induced reactive lung disease.

**"Hospital,"** as used in this provision, means:
1.   a general hospital which:
     (a)   is licensed, approved or certified by the state where it is located;
     (b)   is recognized by the Joint Commission on the Accreditation of Hospitals; or
     (c)   is operated to treat resident inpatients; has a registered nurse always on duty; and has a lab, x-ray facility and place where major surgery is performed; and
2.   a skilled nursing care facility or unit, which provides convalescent or nursing care; and which is recognized as a skilled nursing care facility under Medicare.

The term Hospital also includes:
1.   a Mental Hospital when treatment is for a Mental Sickness; and
2.   a Treatment Center when treatment is for Substance Abuse.

**"Mental Hospital"** means a health care facility (or its psychiatric unit) which:
1.   is licensed, certified or approved as a mental hospital by the state where it is located;
2.   is equipped to treat resident inpatients' mental diseases or disorders; and
3.   has a resident psychiatrist on duty or on call at all times.

## SPECIFIED INJURIES OR SICKNESSES LIMITATION
### (Continued)

**"Mental Sickness"** means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause.  It includes, but is not limited to:

1. schizophrenia or schizoaffective disorder;
2. bipolar affective disorder, manic depression, or other psychosis; and
3. obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider.  Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Mental Sickness does not include irreversible dementia resulting from:

1. stroke, trauma, viral infection, Alzheimer's disease; or
2. other conditions which are not usually treated by a mental health care provider using psychotherapy, psychotropic drugs, or similar methods of treatment.

**"Musculoskeletal/Connective Tissue Injury or Sickness"** includes, but is not limited to:

1. scoliosis that does not require surgery;
2. any other disease or disorder of the cervical, thoracic or lumbosacral back and surrounding soft tissue; unless documented by x-ray, electromyogram, computerized tomography or magnetic resonance imaging;
3. sprains or strains of the muscles, joints and adjacent tissues;
4. fibromyalgia, carpal tunnel syndrome, or repetitive motion syndrome; and
5. myofascial pain, or any craniomandibular or temporomandibular joint disorder (TMJ).

It does **not** include:

1. scoliosis that requires surgery, or spondylolisthesis of grade II or higher;
2. radiculopathies or herniated discs that are documented by x-ray, electromyogram, computerized tomography or magnetic resonance imaging;
3. tumors, malignancies, vascular malformations, or osteopathies;
4. myelopathies, myelitis, or demyelinating disease; or
5. lupus, or rheumatoid or psoriatic arthritis.

**"Substance Abuse"** means alcoholism, drug abuse, or chemical dependency of any type.

**"Treatment Center"** means a health care facility (or its medical or psychiatric unit) which:

1. is licensed, certified or approved by the state where it is located;
2. has a program for inpatient treatment of substance abuse; and
3. provides such treatment based upon a written plan approved and supervised by a Physician.

## MANDATORY VOCATIONAL REHABILITATION BENEFIT PROVISION

**BENEFIT.** If an Insured Employee is Disabled and is receiving Policy benefits; then he or she may be eligible for a Vocational Rehabilitation Benefit. This Benefit consists of services which may include:

1. vocational evaluation, counseling, training or job placement;
2. job modification or special equipment; and
3. other services which the Company deems reasonably necessary to help the Insured Employee return to work.

The Company will determine the Insured Employee's eligibility and the amount of any Benefit payable.

**ELIGIBILITY.** An Insured Employee may be eligible for this Benefit, if the Company finds that he or she:

1. has a Disability that prevents the performance of his or her regular occupation; and, after the Own Occupation Period, also lacks the skills, training or experience needed to perform any other Gainful Occupation;
2. has the physical and mental abilities needed to complete a Program; and
3. is reasonably expected to return to work after completing the Program; in view of the labor force demand for workers in the proposed occupation.

The Company must also find that the cost of the proposed services is less than its expected claim liability.

**AMOUNT.** The amount of any Vocational Rehabilitation Benefit will not exceed the Company's expected claims liability. This benefit will not be payable for services covered under the Insured Employee's health care plan or any other vocational rehabilitation program. Payment may be made to the provider of the services, at the Company's option.

**CONDITIONS.** Either the Company, the Insured Employee, or his or her Physician may first propose vocational rehabilitation. When a Program is approved by the Company, this Policy's definition of "Disability" will be waived during the rehabilitation period; but it will be reapplied after the Program ends. The Company will determine the amount and duration of any Long Term Disability benefits payable after the Program ends.

**LIMITATIONS.** This Policy will not cover any period of Disability:

1. for an Insured Employee who, without good cause, refuses to take part in good faith in a Program designed to return the person to work:
   (a) in his or her regular occupation, during the Own Occupation Period; or
   (b) in any Gainful Occupation after the Own Occupation Period; or
2. for an Insured Employee who has received a Vocational Rehabilitation Benefit and has failed to complete the Program, without Good Cause.

**DEFINITIONS**

**"Gainful Occupation"** means any occupation in which the Insured Employee:

1. is or could reasonably become qualified, considering his or her education, training, experience, and mental and physical abilities;
2. could reasonably find employment, considering the demand in the national labor force; and
3. could earn (or reasonably expect to earn) a before-tax income at least equal to 66.66% of his or her Predisability Income, within 12 months of returning to work.

**"Good Cause"**, as used in this provision, means the Insured Employee's:

1. documented physical or mental impairments, which render the Insured Employee unable to take part in or complete a Program;
2. involvement in a medical program, which prevents or interferes with the Insured Employee's taking part in or completing a Program; or
3. participating in good faith in some other vocational rehabilitation program, which:
   (a) conflicts with taking part in or completing a Program developed by the Company; and
   (b) is reasonably expected to return the Insured Employee to work.

**"Program"** means a written vocational rehabilitation program:

1. which the Company develops with input from the Insured Employee; his or her Physician; and any current or prospective employer, when appropriate; and
2. which describes the Program's goals; each party's responsibilities; and the times, dates and costs of the rehabilitation services.

## REASONABLE ACCOMMODATION BENEFIT

If an Insured Employee of the Employer is Disabled, and is receiving Policy benefits; then the Employer may be eligible for a Reasonable Accommodation Benefit. This Benefit reimburses the Employer for 50% of the expense incurred for reasonable accommodation services for the Insured Employee; but will not exceed:

1.  a maximum benefit of $5,000 for any one Insured Employee; or
2.  the Company's expected liability for the Insured Employee's Long Term Disability claim (whichever is less).

Such services may include:

1.  providing the Insured Employee a more accessible parking space or entrance;
2.  removing barriers or hazards to the Insured Employee from the worksite;
3.  special seating, furniture or equipment for the Insured Employee's work station;
4.  providing special training materials or translation services during the Insured Employee's training; and
5.  other services the Company deems reasonably necessary to help the Insured Employee return to work with the Employer.

ELIGIBILITY FOR BENEFIT. The Company will determine the Employer's eligibility to receive the Benefit. To qualify for the Benefit, the Employer must have an Insured Employee:

(a)  whose Disability prevents the performance of his or her regular occupation at the Employer's worksite;
(b)  who has the physical and mental abilities needed to perform his or her own or another occupation at the Employer's worksite; but only with the help of the proposed accommodation; and
(c)  who is reasonably expected to return to work with the help of the proposed accommodation.

The Company must also find that the requested Reasonable Accommodation Benefit is less than the expected liability for the Insured Employee's Long Term Disability claim.

WRITTEN PROPOSAL. The reasonable accommodation services must be provided in accord with a written proposal, which is developed with input from:

1.  the Employer;
2.  the Insured Employee; and
3.  his or her Physician, when appropriate.

The proposal must state the purpose of the proposed accommodation; and the times, dates and costs of the services.

CONDITIONS. Either the Company, the Employer, the Insured Employee, or his or her Physician may first propose an accommodation.

The proposal must be approved by the Company in writing.

The Company will then reimburse the Employer, upon receipt of proof that the Employer:

1.  has provided the services for the Insured Employee; and
2.  has paid the provider for the services.

GL3001-LTD-17.3

01/01/15

### PRIOR INSURANCE CREDIT UPON TRANSFER OF INSURANCE CARRIERS

To prevent loss of coverage for an Employee because of a transfer of insurance carriers, this Policy will provide Prior Insurance Credit for employees insured under the prior carrier's policy on its termination date as follows.

FAILURE TO BE ACTIVELY-AT-WORK DUE TO INJURY OR SICKNESS.  Subject to premium payments, this Policy will provide coverage to an Employee:
1.   who was insured by the prior carrier's policy at the time of transfer; and
2.   who was not Actively-At-Work due to Injury or Sickness on this Policy's Effective Date.

The coverage will be that provided by the prior carrier's policy, had it remained in force.  The Company will pay:
1.   the benefit that the prior carrier would have paid; minus
2.   any amount for which the prior carrier is liable.

DISABILITY DUE TO A PRE-EXISTING CONDITION.  Benefits may be payable for a Total Disability due to a Pre-Existing Condition for an Employee who:
1.   was insured by the prior carrier's policy at the time of transfer; and
2.   was Actively-At-Work and insured under this Policy on this Policy's Effective Date.

The benefits will be determined as follows:
1.   The Company will apply this Policy's Pre-Existing Condition Exclusion.  If the Insured Employee qualifies for benefits, such Insured Employee will be paid according to this Policy's benefit schedule.
2.   If the Insured Employee cannot satisfy this Policy's Pre-Existing Condition Exclusion, but can satisfy the prior carrier's pre-existing condition exclusion giving consideration towards continuous time insured under both policies; then he or she will be paid in accord with the benefit schedule and all other terms, conditions and limitations of:
     (a)   this Policy without applying the Pre-Existing Condition Exclusion; or
     (b)   the prior carrier's policy;
     whichever is less.
3.   If the Insured Employee cannot satisfy the Pre-Existing Condition Exclusion of this Policy or that of the prior carrier, no benefit will be paid.

Prior Insurance Credit

## FAMILY INCOME BENEFIT

The Company will pay a lump sum benefit to the Eligible Survivor when proof is received that an Insured Employee died:
1.   after Disability had continued for 180 or more consecutive days; and
2.   while receiving a Monthly Benefit.

The benefit will be equal to three times the Insured Employee's Last Monthly Benefit.

"Last Monthly Benefit" means the gross Monthly Benefit payable to the Insured Employee immediately prior to death.  Any reductions for Other Income Benefits, or for earnings the Insured Employee received for Partial Disability Employment, will not apply.

"Eligible Survivor" means the Insured Employee's:
1.   surviving spouse; or, if none
2.   surviving children who are under age 25 on the Insured Employee's date of death.

If payment becomes due to the Insured Employee's children; then payment will be made to:
1.   the surviving children, in equal shares; or
2.   a person named by the Company to receive payments on the children's behalf.

This payment will be valid and effective against all claims by others representing, or claiming to represent, the children.

Three Month Survivor Benefit

# FAMILY CARE EXPENSE BENEFIT

**BENEFIT.**  The Company will reimburse an Insured Employee's Family Care Expenses as described below, while he or she is:
1. receiving a Partial Disability Monthly Benefit under this Policy; or
2. receiving a Total Disability Benefit under this Policy, and:
   a. is Terminally Ill; or
   b. has suffered a Cognitive Impairment.

The Family Care Expense Benefit is paid in addition to all other Policy benefits and will not be offset by Other Income Benefits.

**PROOF.**  The Insured Employee must submit to the Company satisfactory proof that a Family Care Expense has been incurred for a Dependent and paid by the Insured Employee.  Proof must be submitted on a monthly basis.  Satisfactory proof is a signed receipt from the Dependent care provider showing:
1. Dependent name;
2. Dependent age;
3. if Dependent age exceeds the maximum shown in definition of "Dependent" below, reason for care;
4. dates of care;
5. total charges for care;
6. total payments for care; and
7. provider name, address, telephone number, and Federal Employer Identification Number/Taxpayer Identification Number.

**AMOUNT.**  The Family Care Expense Benefit will equal actual Family Care Expenses paid by the Insured Employee that are not reimbursable from other sources, up to $250 per month for each eligible Dependent.

**DURATION.**  The Family Care Expense Benefit will cease on the earliest of:
1. the date the Insured Employee's Total or Partial Disability Benefits under this Policy cease;
2. the date an Insured Employee's Dependents no longer meet the definition of Dependent in this provision; or
3. the date the Company has made 12 monthly Family Care Expense Benefit payments.

**DEFINITIONS.**

**"Child"** includes the Insured Employee's naturally born child, legally adopted child, stepchild, foster child, or child for whom the Insured Employee is the legal guardian.

**"Cognitive Impairment"** means that the Insured Employee or Dependent:
1. has suffered a permanent deterioration or loss of cognitive or intellectual capacity; and
2. requires another person's active, hands-on help or verbal cues to prevent harm to self or others, due to that impairment.

The impairment must be diagnosed by a Physician, based upon clinical evidence and reliable standardized tests of short or long-term memory; orientation as to person, place and time; and deductive or abstract reasoning.  It may result from moderate to severe head trauma, stroke, Alzheimer's disease or other form of irreversible dementia.

GL3001-LTD-41-FC TN

NO ADL
01/01/15

## FAMILY CARE EXPENSE BENEFIT
### (Continued)

**"Dependent"** means the Insured Employee's:
1. legal spouse, who is:
   a. living with the Insured Employee; and
   b. Incapable of Independent Living due to a mental or physical condition;
2. Child less than age 16;
3. unmarried Child age 16 years or older, who is:
   a. living with the Insured Employee; and
   b. Incapable of Independent Living due to a mental or physical condition; or
4. parent or parent-in-law, who is:
   a. living with the Insured Employee; and
   b. Incapable of Independent Living due to a mental or physical condition.

**"Family Care Expense"** means an expense for the care of a Dependent, charged by a licensed care provider who:
1. is not a member of the Insured Employee's immediate family; and
2. is not living in the Insured Employee's home.

**"Incapable of Independent Living"** means the Dependent:
1. is Terminally Ill;
2. suffers a Cognitive Impairment; or
3. suffers a Loss of Activities of Daily Living.

**"Terminally Ill"** means the Insured Employee or Dependent has a medical condition which is expected to result in death within 12 months, despite appropriate medical treatment.

## NOTICE CONCERNING COVERAGE UNDER

## THE TENNESSEE LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION ACT

Residents of Tennessee who purchase life insurance, annuities or health insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Tennessee Life and Health Insurance Guaranty Association. The purpose of this association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the claims of the insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however. And, as noted below, this protection is not a substitute for consumers' care in selecting companies that are well-managed and financially stable.

The state law that provides for this safety-net coverage is called the Tennessee Life and Health Insurance Guaranty Association Act. The following is a brief summary of this law's coverages, exclusions and limits. **This summary does not cover all provisions of the law or describe all of the conditions and limitations relating to coverage. This summary does not in any way change anyone's rights or obligations under the act or the rights or obligations of the Guaranty Association.**

COVERAGE

Generally, individuals will be protected by the Life and Health Insurance Guaranty Association if they live in this state and hold a life or health insurance contract, an annuity, or if they are insured under a group insurance contract issued by an insurer authorized to conduct business in Tennessee. Health insurance includes disability and long term care policies. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

EXCLUSIONS FROM COVERAGE

However, persons holding such policies are not protected by this Guaranty Association if:

1) They are eligible for protection under the laws of another state (this may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state);

2) The insurer was not authorized to do business in this state;

3) Their policy was issued by an HMO, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company or similar plan in which the policyholder is subject to future assessments, or by an insurance exchange.

The Guaranty Association also does not provide coverage for:

1) Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;

2) Any policy of reinsurance (unless an assumption certificate was issued);

3) Interest rate yields that exceed an average rate;

4) Dividends;

5) Credits given in connection with the administration of a policy by a group contractholder;

6) Employers' plans to the extent they are self-funded (that is, not insured by an insurance company, even if an insurance company administers them);

7) Unallocated annuity contracts (which give rights to group contractholders, not individuals);

**EXHIBIT 1, page 42**

## LIMITS ON AMOUNT OF COVERAGE

The act also limits the amount the Guaranty Association is obligated to pay out. The Guaranty Association cannot pay more than what the insurance company would owe under a policy or contract. For any one insured life, the Guaranty Association guarantees payments up to a stated maximum no matter how many policies and contracts there were with the same company, even if they provided different types of coverage. These aggregate limits per life are as follows:

- $300,000 for policies and contracts of all types, except as described in the next point

- $500,000 for basic hospital, medical and surgical insurance and major medical insurance issued by companies that become insolvent after January 1, 2010

Within these overall limits, the Guaranty Association cannot guarantee payment of benefits greater than the following:

- Life insurance death benefits - $300,000

- Life insurance cash surrender value - $100,000

- Present value of annuity benefits for companies insolvent before July 1, 2009 - $100,000

- Present value of annuity benefits for companies insolvent after June 30, 2009 - $250,000

- Health insurance benefits for companies declared insolvent before January 1, 2010 - $100,000

- Health insurance benefits for companies declared insolvent on or after January 1, 2010:

  o $100,000 for limited benefits and supplemental health coverages

  o $300,000 for disability and long term care insurance

  o $500,000 for basic hospital, medical and surgical insurance or major medical insurance


The Tennessee Life and Health Insurance Guaranty Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in Tennessee. You should not rely on coverage by the Tennessee Life and Health Insurance Guaranty Association in selecting an insurance company or in selecting an insurance policy.

Coverage is NOT provided for your policy or any portion of it that is not guaranteed by the insurer for which you have assumed the risk, such as a variable contract sold by prospectus.

Insurance companies or their agents are required by law to give or send you this notice. However, insurance companies and their agents are prohibited by law from using the existence of the Guaranty Association to induce you to purchase any kind of insurance policy.

<div align="center">

Tennessee Life and Health Insurance Guaranty Association
1200 One Nashville Place
150 4th Avenue North
Nashville, Tennessee  37219

Tennessee Department of Commerce and Insurance
500 James Robertson Parkway
Nashville, Tennessee  37243

</div>

# FAX

| Date: | 11/11/2019 |
|---|---|

| Pages including cover sheet: | 3 |
|---|---|

| **To:** | 18778433950@rcfax.com |
|---|---|
| | |
| | |
| | |
| | |
| | |
| *Phone* | |
| *Fax Phone* | *(877) 843-3950* |

| **From:** | McMath Woods |
|---|---|
| | McMath Woods P.A. |
| | 711 West 3rd St. |
| | Little Rock |
| | AR                72201 |
| | |
| *Phone* | 15013965400 |
| *Fax Phone* | 18885801754 |

NOTE:

**EXHIBIT 1, page 44**

From: McMath Woods          Fax: 18885801754          To: 18778433950@rcfax.com     Fax: (877) 843-3950          Page: 2 of 3          11/11/2019 3:51 PM



**EXHIBIT 1, page 45**

SAMUEL E. LEDBETTER
WILL BOND
NEIL CHAMBERLIN
CHARLES D. HARRISON
JOHN D. COULTER
CARTER C. STEIN

JAMES BRUCE McMATH, OF COUNSEL
PHILLIP H. McMATH, OF COUNSEL

SIDNEY S. McMATH (1912-2003)
HENRY WOODS (1918-2002)
WINSLOW DRUMMOND (1933-2005)
LELAND F. LEATHERMAN (1915-2006)



# MCMATH WOODS P.A.

INJURY, ENVIRONMENTAL & EMPLOYMENT ATTORNEYS

711 WEST THIRD STREET
LITTLE ROCK, AR 72201
501-396-5400
FAX: 501-374-5118
www.mcmathlaw.com

NEIL CHAMBERLIN
Direct. No. 501-396-5411
neil@mcmathlaw.com

WHITNEY ALLEN
Paralegal
Direct No. 501-396-5444
whitney@mcmathlaw.com

November 11, 2019

***By Fax at 877-843-3950 to:***

Joan Waldron
Specialist, Claims
The Lincoln National Life Insurance Company
P.O. Box 2609
Omaha, NE 68103-2609
Tel. 800-423-2765 *3030

     Re:    Policyholder:     EdFinancial Services LLC
             Policy Number:    00001019974200000
             Claim Number:     1170107164
             Claimant:          Marilyn Campbell

Dear Ms. Waldron:

    We represent Marilyn Campbell on her claim for long term disability benefits.  The Lincoln National Life Insurance Company terminated those benefits by letter dated 10/23/2019.  Please produce:  (1) all documents, records, and other information relevant to the claimant's claim for benefits; (2) all summary plan descriptions, disability insurance policies, and other plan terms.

                      Sincerely,

                      Neil Chamberlin

**EXHIBIT 1, page 46**

REF #4872000



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life
Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

October 23, 2019

MARILYN  CAMPBELL
820 North St. Apt. 4
LITTLE ROCK, AR 72201

Re:    Policyholder:  EdFinancial Services LLC
       Policy Number: 00001019974200000
       Claim Number: 1170107164
       Claimant:  Marilyn Campbell

Dear Ms. Campbell:

We have completed our review of your Long Term Disability claim and have determined that no benefits are payable beyond 10/19/2019.

To be eligible for benefits under the policy issued to your employer, an individual must satisfy all of the provisions of the policy.  This includes but is not limited to the following:

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows
1.   During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
2.   After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any Gainful Occupation.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

**Information reviewed and action taken**

After a thorough review of the information currently contained in your claim file, we have determined that you do not meet the definition of Total Disability, as defined above. Outlined below is the information reviewed which led to our determination.

In our review process, all information previously submitted as well as any new documentation is used to make a determination.  The documentation contained in your claim file includes, but is not limited to the following:

©2019  Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

- Office and treatment notes from Dr. Ghulam Khaleel covering the 10/19/2017 to 10/25/2018
- Office and treatment notes from AR Spine and Pain for the period of 1/9/2018 to 3/27/2018
- Office notes from Arkansas Specialty Orthopaedics from 12/21/2016 to 09/14/2017
- Progress notes from the Mocek Spine clinic dated 9/28/217
- Progress notes from Neurology Consultants from 03/05/2019 to 07/30/2019
- Independent Medical examination (IME) dated 12/12/2018
- X-ray results from Arkansas Sepciality Orthopaedics from 12/21/2016 to 09/14/2017

According to the information contained in your claim file, you stopped working on 10/20/2017 due to a diagnosis of post laminectomy syndrome

Dr. Ghulam Mohammed Khaleel completed and the Attending Physician's Statement on 11/28/2017, on which he states you had severe back pain, weakness in both lower extremities, difficulty climbing steps or bend. You also reported that you could not sit on your butt for more than hour, you could nt shower and had to ambulate with a cane.

The documentation in your claim file showed that you were seen by Dr. Kathryn McCarthy for lumbosacral discomfort following a fall in the summer of 2016. Upon examination by Dr. McCarthy she noted lumbar area tenderness however, you had normal strength, sensation and gain. Dr. McCarthy recommended S1 joint stabilization.  On 2/8/2017 you had a  MRI of the lumbar spine, the results showed a facet cyst at the L4-5 with significant lateral recess stenosis.

On 02/24/2017 you had a laminectomy with facet cyst excision, following this surgery you had a MRI of the lumbar spine done on 4/20/2017. The findings showed the post-surgical changes and facet arthritis at the L4-5 and L5-S1. X-ray of the lumbar spine showed spondylolisthesis at L4-5.  On 05/02/2017 you had a revision decompression with discectomy at the right L4-5. The Post-operative x-ray showed normal alignment after the fusion of the L4 and L6

Letter on file from Dr. Kathryn McCarthy dated 6/6/2017 released you to return to work 4 hours of work per day with restrictions of no bending, lifting or twisting. At the office visit on 6/6/2017 you reported remarkable improvement in the back however, you had complaints of bilateral leg pain. Upon physical examination by Dr. McCarthy she noted that you were neurologically intact but were unable to walk up to 1.5 miles.  Your leg pain resolved, but you still had complaints of left posterior hip and back pain. You had an EMG and the findings were normal.

On 3/27/2018 you were seen by Dr. Martha Rueda for your complaints of constant pain in the low back and right buttocks. You were on the following medication: Gabapentin, Amitriptyline and baclofen. You reported head ache, depression, anxiety and difficulty in urination. On physical examination there was lumbar tenderness with limited range of motion (ROM) with normal motor and sensory function. Dr. Reuda planned to perform trigger point injections in the lumbar area.

You had nerve blocks following pain management. You reported that Lyrica was not helping with the pain. You were not able to walk without a walker and reported that you were dropping this. You remained on Klonopin for insomnia.

**EXHIBIT 1, page 48**

REF #4872000

The residual functional capacity evaluation you had on 12/12/2018 noted that you did not meet the demand minimum functional capacity requirements for standing, sitting, walking, lifting, carrying, pushing, pulling, climbing and kneeling.

On 6/18/2019 the claimant was seen by Dr. Ghulam Khaleel for headaches and chronic pain. At this visit, diagnoses of bursitis and anxiety were noted. You reported that you had a fall at home and had a left ankle sprain. You were required to use a walker to ambulate. You reported that you were having 3-4 migraines per week.  Dr.Khaleel noted that you were diagnosed with irritable bowel syndrome and insomnia and was on Klonopin. You had an EEG monitoring, however the findings for seizures were negative from the EEG. Your neurological examination was also unremarkable.

On 7/30/2019 you were found to have osteoarthritis and contusion of the left knee however there was a normal neurological examination.

We had an Independent Peer Review conducted on your behalf by Mostafa Farache, M.D., Board Certified, American Board of Neuroology and Psychiatry and Board Certified , American Board of Neurophysiology. The findings of this review determined that you do have some impairment in your gait stability

It is important to note that the policy under which you are covered refers to and is governed by the main duties of your regular "occupation" and not by the duties of your specific job.  Nearly every job in the economy is performed slightly different from one employer to another. However, the Department of Labor groups jobs into occupations based on their similarities. The term "occupation" refers to a collective description of a number of individual jobs that are performed, with variations, in many establishments.  Consequently, there will be similarities between the main duties of your occupation and those of your job.  There may also be some differences.

In addition to the medical documentation submitted to our office, we obtained your written job description, your employer's description of your job duties, and the description of your occupation from the Department of Labor's Dictionary of Occupation Titles 186137014 In order to be eligible for Long Term Disability benefits, you must have been unable to perform each of the main duties of your occupation, as they would be performed in a typical setting for an employer,

The contract issued to EdFinancial Services LLC states, in part:

**EXHIBIT 1, page 49**

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1.    are normally required to perform the Insured Employee's Own Occupation; and
2.    could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation.  It will apply the Act's standards, whether or not:
1.    the Employer is subject to the Act; or
2.    the Insured Employee has requested such a job accommodation.
An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

Main Duties include those job tasks:
1.    as described in the U.S. Department of Labor Dictionary of Occupational Titles; and
2.    as performed in the general labor market and national economy.
Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site.

Based on information obtained from your employer and occupational information contained within the *Dictionary of Occupational Titles* (DOT), we have determined that your occupation is best defined as an OPERATIONS OFFICER (financial) in the national workforce.

We reviewed the medical documentation provided in conjunction with the written job description, your employer's description of your job duties, and the Department of Labor's Dictionary of Occupational Titles (DOT), and determine that the medical evidence does not support Total Disability as defined by the policy.

### Summary

In summary, the medical documentation contained in your claim file does not support Total Disability as defined by the policy. Your condition does have some impairment in your gait stability. However, you have no restrictions to sitting, you are able to stand and walk frequently with the use of an assistive device. You have no restriction to finger manipulation, handling, grasping and typing. You are able to lift up to 20 pounds frequently, reach at waist level. Based upon the restrictions and limitations

If you disagree with our decision, you may appeal this determination by following the steps outlined below.

### Appeal Rights

You, your attorney or a person legally authorized as your representative may appeal the denial by requesting a review of your denied claim.  To initiate this process, submit your written request for review to us at the following address within 180 days after you receive this denial notice.

Claims Shared Services
The Lincoln National Life Insurance Company
PO Box 2337
Omaha, NE 68103

**EXHIBIT 1, page 50**

Fax: 402-361-1460

Please include the following with your appeal:

1. The policy and claim number;
2. Your reason(s) for appealing; and
3. If applicable, any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results.

Following receipt of your appeal, we will review the claim and provide you with a full written explanation of the decision within 45 days.  You may also request copies of records and other information relevant to your claim free of charge.

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency.  In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law.

Please contact our office with any questions you may have at the number listed below or email us at Claims@LFG.com.  You can also register for our website at www.Lincoln4Benefits.com to view your benefits and claim status online 24 hours a day.


Sincerely,


Joan Waldron
800-423-2765 *3030
Specialist, Claims
The Lincoln National Life Insurance Company


**EXHIBIT 1, page 51**

Chinese (Simplified)

注意：如果您说普通话，可以选择免费语言支持服务。 请拨打 1-800-423-2765.


Chinese (Traditional)

注意：若您講國語，可使用我們的免費語言支援服務。 請致電 1-800-423-2765.


Tagalog

Pansinin: Kung nagsasalita ka ng Tagalog, mayroon kang magagamit na mga libreng serbisyo ng tulong sa wika. Tumawag sa 1-800-423-2765.


Spanish

Atención: si habla español, tenemos disponibles servicios de apoyo con el idioma sin costo para usted. Llame al 1-800-423-2765.


Navajo

DÍÍ BAA AKÓ NÍNÍZIN:  Díí bee yáníłti'go  Diné bizaad, saad bee áká'ánida'áwo'déé' t'áá jiik'eh, ná hólǫ́.  Koji' hódíílnih áǫįóóǫ́ęą́ą́ǫą́įę́ę.

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-Feb-19  14:50:43
60CV-21-1276
C06D12 : 35 Pages

**Neil Chamberlin**

| | |
|---|---|
| **From:** | Whitney Morrow |
| **Sent:** | Thursday, January 2, 2020 4:29 PM |
| **To:** | twilliams@asla.info |
| **Cc:** | Neil Chamberlin |
| **Subject:** | Marilyn Campbell |
| **Attachments:** | 1-2-2020 Tony Williams Re_ FOIA Request.pdf |

Mr. Williams:  Please see attached.  Thank you.



**Whitney Allen**
McMath Woods P.A.
711 West Third Street
Little Rock, AR 72201
Office:         (501) 396-5400
**Direct**:      (501) 396-5444
**Fax:**         (501) 374-5118
Email:          Whitney@mcmathlaw.com
Website:     www.mcmathlaw.com

**EXHIBIT 2, page 1**

SAMUEL E. LEDBETTER
WILL BOND
NEIL CHAMBERLIN
CHARLES D. HARRISON
JOHN D. COULTER
CARTER C. STEIN

JAMES BRUCE McMATH, OF COUNSEL
PHILLIP H. McMATH, OF COUNSEL

SIDNEY S. McMATH (1912-2003)
HENRY WOODS (1918-2002)
WINSLOW DRUMMOND (1933-2005)
LELAND F. LEATHERMAN (1915-2006)



# McMATH WOODS P.A.
INJURY, ENVIRONMENTAL & EMPLOYMENT ATTORNEYS

711 WEST THIRD STREET
LITTLE ROCK, AR 72201
501-396-5400
FAX: 501-374-5118
www.mcmathlaw.com

NEIL CHAMBERLIN
Direct. No. 501-396-5411
neil@mcmathlaw.com

WHITNEY ALLEN
Paralegal
Direct No. 501-396-5444
whitney@mcmathlaw.com

January 2, 2020

**_By email to:_**

Tony Williams, CEO
Arkansas Student Loan Authority
3801 Woodland Heights, Suite 200
Little Rock, AR 72212
_twilliams@asla.info_

Re:    Marilyn Campbell

Dear Mr. Williams:

This is a request for information under the **_Arkansas Freedom of Information Act._**

We represent Marilyn Campbell on her claim for disability benefits from The Lincoln National Life Insurance Company ("Lincoln"). Marilyn is insured under a plan issued by Lincoln to EdFinancial Services LLC ("EdFinancial") but covering only employees of EdFinancial working on "Government Contracts." I understand that Marilyn worked on behalf of the Arkansas Student Loan Association ("ASLA") under an agreement between ASLA and EdFinancial. Per Lincoln's records, Marilyn's last day worked was October 20, 2017. The terms of the agreement between ASLA and EdFinancial could affect what law governs Marilyn's claim.

**_Therefore, this is my request that you produce all contracts or other agreements under which employees of EdFinancial worked on behalf of ASLA in effect as of October 20, 2017._**

Sincerely,

Neil Chamberlin

**EXHIBIT 2, page 2**

## Neil Chamberlin

| | |
|---|---|
| **From:** | Tony Williams <TWilliams@asla.info> |
| **Sent:** | Friday, January 3, 2020 9:03 AM |
| **To:** | Whitney Morrow |
| **Cc:** | Neil Chamberlin |
| **Subject:** | RE: Marilyn Campbell |
| **Attachments:** | EDFINANCIAL PROGRAM ADMINISTRATION JULY 2015 TO JUNE 2017.pdf; Edfinancial Services LLC Program Administration A1 2017 to 2019.pdf |

Ms. Allen,
I have attached the contract that Marilyn Campbell worked under through 06/30/17 along with an extension to the contract.  The hiring of Edfinancial employees in the ASLA office is addressed in Section 2.1(b.).

Please let me know if you need more information.
Tony

**Tony Williams**
Director
Arkansas Student Loan Authority
Division of the Arkansas Development Finance Authority
3801 Woodland Heights Road
Little Rock, AR  72212

800.443.6030  Main
501.682.1241  Direct
501.773.4577  Mobile

*Student Loan Assistance*
  

*College Planning Services*
  

**From:** Whitney Morrow <Whitney@mcmathlaw.com>
**Sent:** Thursday, January 2, 2020 4:29 PM
**To:** Tony Williams <TWilliams@asla.info>
**Cc:** Neil Chamberlin <Neil@mcmathlaw.com>
**Subject:** Marilyn Campbell

Mr. Williams:  Please see attached.  Thank you.

**EXHIBIT 2, page 3**

**Whitney Allen**
McMath Woods P.A.
711 West Third Street
Little Rock, AR 72201
Office: (501) 396-5400
**Direct**: (501) 396-5444
**Fax:** (501) 374-5118
Email: Whitney@mcmathlaw.com
Website: www.mcmathlaw.com

This e-mail may contain CONFIDENTIAL information and is intended only for the use of the specific individual(s) to whom it is addressed. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use, dissemination or copying of this e-mail or the information contained in it or attached to it is strictly prohibited. If you have received this e-mail in error, please delete it and immediately notify the person named above by telephone. Thank you.



# STATE OF ARKANSAS
## PROFESSIONAL CONSULTANT SERVICES CONTRACT

| CONTRACT # | 46003 4526 | FEDERAL I.D. # | 20-5316278 |
|---|---|---|---|
| VENDOR # | 100027394 | MINORITY VENDOR | YES ☐   NO ☒ |

## 1. PROCUREMENT:

Check ONE appropriate box below for the method of procurement for this contract:

☐ ABA Criteria      ☐ Request for Proposal      ☐ Competitive Bid      ☒ Request for Qualifications
☐ Intergovernmental      ☐ Emergency
☐ Sole Source by Justification *(Justification must be attached)*      ☐ Sole Source by Intent to Award
☐ Sole Source by Law - Act # _____      or Statute #: _____

## 2. TERM DATES:

The term of this agreement shall begin on   07/01/2015   and shall end on   06/30/2017 .
                                           (mm/dd/yyyy)                          (mm/dd/yyyy)

## 3. CONTRACTING PARTIES:

State of Arkansas is hereinafter referred to as the agency and contractor is herein after referred to as the Vendor.

| AGENCY NUMBER & NAME | 0347 | Arkansas Student Loan Authority | ☒ Service Bureau |
|---|---|---|---|

| VENDOR NAME | Edfinancial Services LLC (Program Administration) | |
|---|---|---|
| VENDOR ADDRESS | 298 North Seven Oaks Dr.,Knoxville, TN 37922 | |
| TRACKING # 1 | N/A | TRACKING # 2   N/A |

## 4A. PROJECTED TOTAL CONTRACT COST:

| Projected total cost of entire project if all available extensions of this contract are completed (up to the date anticipated and stated in Section 13) | $ 3,900,000.00 |
|---|---|

## 4B. CALCULATIONS OF COMPENSATION:

For work to be accomplished under this agreement, the Vendor agrees to provide the personnel at the rates scheduled for each level of consulting personnel as listed herein. Calculations of compensation and reimbursable expenses shall only be listed in this section. If additional space is required, a continuation sheet may be used as an attachment.

| LEVEL OF PERSONNEL | NUMBER | COMPENSATION RATE | TOTAL FOR LEVEL |
|---|---|---|---|
| See Fee Schedule In Attachment 1 | | | $1,200,000.00 |
| | | | |
| | | | |

Total compensation exclusive of expense reimbursement      $ 1,200,000.00

| REIMBURSABLE EXPENSES ITEM (Specify) | ESTIMATED RATE OF REIMB. | TOTAL |
|---|---|---|
| N/A | | |
| | | |
| | | |

Total reimbursable expenses      $ _____

Total compensation inclusive of expense reimbursement      $ 1,200,000.00

**EXHIBIT 2, page 5**

**STATE OF ARKANSAS**
**PROFESSIONAL CONSULTANT SERVICES CONTRACT**

Contract # : *4600034526*

5. **SOURCE OF FUNDS:**

Complete appropriate box(es) below to total 100% of the funding in this contract. You may use an attachment if needed.

| Fund Source | Identify Source of Funds* | Fund | Fund Center | Amount of Funding | % of Total Contract Cost |
|---|---|---|---|---|---|
| Federal Funds | | | | $ | |
| State Funds** | | | | $ | |
| Cash Funds | Revenue Bond Proceeds | 157 | A51 | $1,200,000.00 | 100% |
| Trust Funds | | | | $ | |
| Other Funds | | | | $ | |
| | | | TOTALS | $1,200,000.00 | 100% |

* **MUST BE SPECIFIC** (i.e. fees, tuition, agricultural sales, bond proceeds, donations, etc.)

' ' "State Funds" is defined as and deemed State General Revenue Dollars. If other state funds are being used such as tobacco funds, general improvement funds, etc., these should be noted. Special revenue funds from taxes or fees generated for the agencies should be shown as "Other" and the actual source of the funds should be clarified in the "Identify Source of Funds."

6. **RENDERING OF COMPENSATION:**

The method(s) of rendering compensation and/or evaluation of satisfactory achievement toward attainment of the agreement listed herein is as follows, or in attachment no. __1__ to this agreement.

See Fee Schedule in Attachment 1

7. **OBJECTIVES AND SCOPE:**

State description of services, objectives, and scope to be provided.  (DO NOT USE "SEE ATTACHED")

Objectives and Scope include but are not limited to, the following:
-provide management and personnel related to the successful operation of ASLA's loan programs, default management programs and college planning services; assist ASLA in providing college planning services to AR high schools and counselors through participation in college fairs, financial aid seminars, and attendance at guidance counselor conferences; assist in the development of promotional and educational materials related to:financial aid education, default prevention and responsible borrowing, and college planning; provide webhosting for ASLA's websites,including development and maintenance of same;
administer ASLA's IT network,software and provide general administrative

8. **PERFORMANCE STANDARDS:** services related to IT.

List Performance standards for the term of the contract.  (If necessary, use attachments)

See Attachment 1

**EXHIBIT 2, page 6**

**STATE OF ARKANSAS**
**PROFESSIONAL CONSULTANT SERVICES CONTRACT**

Contract # : 4600034526

**9.** **ATTACHMENTS:**
List ALL attachments to this contract by attachment number:

Attachment 1

**10.** **CERTIFICATION OF VENDOR**

**A.** "I, William A. Hollin          President & CEO
(Vendor)                    (Title)
certify under penalty of perjury that, to the best of my knowledge and belief, no regular full-time or part-time employee of any State agency of the State of Arkansas will receive any personal, direct or indirect monetary benefits which would be in violation of the law as a result of the execution of this contract." Where the Vendor is a widely-held public corporation, the term 'direct or indirect monetary benefits' "shall not apply to any regular corporate dividends paid to a stockholder of said corporation who is also a State employee and who owns less than ten percent (10%) of the total outstanding stock of the contracting corporation."

**B.** List any other contracts or subcontracts you have with any other state government entities. (Not applicable to contracts between Arkansas state agencies) (If no contracts or subcontracts, please put "N/A" or "None")

None

**C.** Are you currently engaged in any legal controversies with any state agencies or represent any clients engaged in any controversy with any Arkansas state agency? (If no controversies, please put "N/A" or "None")

No

**D.** The Vendor agrees to list below, or on an attachment hereto, names, addresses, and relationship of those persons who will be supplying services to the state agency at the time of the execution of the contract. If the names are not known at the time of the execution of the contract, the Vendor shall submit the names along with the other information as they become known. Such persons shall, for all purposes, be employees or independent contractors operating under the control of the Vendor (sub-contractors), and nothing herein shall be construed to create an employment relationship between the agencies and the persons listed below.

| NAME | RELATIONSHIP |
|---|---|
| William A. Hollin | President & CEO |
| John J. Farinella | Sr. VP & COO |
| | |
| | |
| | |

**E.** The agency shall exercise no managerial responsibilities over the Vendor or his employees. In carrying out this contract, it is expressly agreed that there is no employment relationship between the contracting parties.

FORM OSP-1                     Page 3 of 5                     11/01/12

**STATE OF ARKANSAS**
**PROFESSIONAL CONSULTANT SERVICES CONTRACT**

Contract # : *4600034526*

11.   **DISCLOSURE REQUIRED BY EXECUTIVE ORDER 98-04:**

Any contract or amendment to a contract executed by an agency which exceeds $25,000 shall require the Vendor to disclose information as required under the terms of Executive Order 98-04 and the Regulations pursuant thereto. The Vendor shall also require the subcontractor to disclose the same information. The Contract and Grant Disclosure and Certification Form (Form PCS-D attachment II-10.3) shall be used for this purpose.

Contracts with another government entity such as a state agency, public education institution, federal government entity, or body of a local government are exempt from disclosure requirements.

The failure of any person or entity to disclose as required under any term of Executive Order 98-04, or the violation of any rule, regulation or policy promulgated by the Department of Finance and Administration pursuant to this Order, shall be considered a material breach of the terms of the contract, lease, purchase agreement, or grant and shall subject the party failing to disclose, or in violation, to all legal remedies available to the Agency under the provisions of existing law.

12.   **NON-APPROPRIATION CLAUSE:**

"In the event the State of Arkansas fails to appropriate funds or make monies available for any biennial period covered by the term of this contract for the services to be provided by the Vendor, this contract shall be terminated on the last day of the last biennial period for which funds were appropriated or monies made available for such purposes.

This provision shall not be construed to abridge any other right of termination the agency may have."

13.   **TERMS:**

The term of this agreement begins on the date in SECTION 2 and will end on the date in SECTION 2, and/or as agreed to separately in writing by both parties.

This contract may be extended until  06/30/2022  (mm/dd/yyyy), in accordance with the terms stated in the Procurement, by written mutual agreement of both parties and subject to:  approval of the Arkansas Department of Finance and Administration/Director of Office of State Procurement, appropriation of necessary funding, and review by any necessary state or federal authority.

Amendments to contracts will require review by Legislative Council or Joint Budget Committee prior to approval by the Department of Finance and Administration/Director of Office of State Procurement if the original contract was reviewed by Legislative Council or Joint Budget Committee and the amendment increases the dollar amount or involves major changes in the objectives and scope of the contract.

Amendments (to contracts that originally did not require review by Legislative Council or Joint Budget Committee) which cause the total compensation to exceed the sum of $50,000, shall require review by the Legislative Council or Joint Budget Committee, prior to the approval of the Department of Finance and Administration/Director of Office of State Procurement and before the execution date of the amendment.

This contract may be terminated by either party upon 30 day written notice, unless otherwise agreed by both parties.

14.   **AUTHORITY:**

A.   This contract shall be governed by the Laws of the State of Arkansas as interpreted by the Attorney General of the State of Arkansas and shall be in accordance with the intent of Arkansas Code Annotated §19-11-1001 et seq.

B.   Any legislation that may be enacted subsequent to the date of this agreement, which may cause all or any part of the agreement to be in conflict with the laws of the State of Arkansas, will be given proper consideration if and when this contract is renewed or extended; the contract will be altered to comply with the then applicable laws.

**EXHIBIT 2, page 8**

**STATE OF ARKANSAS**
**PROFESSIONAL CONSULTANT SERVICES CONTRACT**                    Contract # : _____

15.  **AGENCY CONTACTS FOR QUESTION(S) REGARDING THIS CONTRACT:**

    **Contact #1 –** Agency Representative submitting/tracking this contract

    Rose Brooke                 Executive Assistant
          (Name)                         (Title)

    501-682-2952             rbrooke@asla.info
        (Telephone #)                 (Email)

    **Contact #2 –** Agency Representative with knowledge of this project (for general questions and responses)

    Mark Conine                 CFO
          (Name)                         (Title)

    501-682-2952             mconine@asla.info
        (Telephone #)                 (Email)

    **Contact #3 –** Agency Representative Director or Critical Contact (for time sensitive questions and responses)

    Tony Williams              Executive Director
          (Name)                         (Title)

    501-682-2952             twilliams@asla.info
        (Telephone #)                 (Email)

16.  **AGENCY SIGNATURE CERTIFIES NO OBLIGATIONS WILL BE INCURRED BY A STATE AGENCY UNLESS SUFFICIENT FUNDS ARE AVAILABLE TO PAY THE OBLIGATIONS WHEN THEY BECOME DUE.**

17.  **SIGNATURES:**

    _____ 5/4/15      _____ 5/4/15
    **VENDOR**           **DATE**          **AGENCY DIRECTOR**        **DATE**

    William A. Hollin, President      Tony Williams, Executive Director
    **TITLE**         & CEO           **TITLE**
    298 North Seven Oaks Drive      3801 Woodland Heights Rd., Ste.200
    Knoxville, TN  37922          Little Rock, AR  72212
    **ADDRESS**                   **ADDRESS**

    **APPROVED:**    _____    06-12-2015  RB
              **DEPARTMENT OF FINANCE AND ADMINISTRATION**        **DATE**

**EXHIBIT 2, page 9**

Arkansas Department of Finance and Administration                                   Page 1 of 1

Welcome Guest - Login

## Submission Confirmation

Thank you for your submission. This submission is valid for one year.

We have recorded your submission. Please click here to return to the home page.

Print Disclosure Submission

| | |
|---|---|
| **Vendor:** | Edfinancial Services, LLC |
| **Tax ID:** | 6278 |
| **Disclosure Statement:** | I certify that I DO NOT employ or contract with an illegal immigrant. |
| **Contact E-mail:** | kwatson@edfinancial.com |
| **Submitted on:** | 05-04-15 |
| **Valid through:** | 05-02-16 |

EXHIBIT 2, page 10

**Kim Watson**

| | |
|---|---|
| **From:** | Illegal Immigrant Form <AASIS-OSP@dfa.arkansas.gov> |
| **Sent:** | Monday, May 04, 2015 12:42 PM |
| **To:** | Kim Watson |
| **Subject:** | Illegal Immigrant Form |

# DFA Illegal Immigrant Contractor Disclosure Certification

## Illegal Immigrant Form

| | |
|---|---|
| **Vendor:** | Edfinancial Services, LLC |
| **Tax ID:** | 6278 |
| **Disclosure Statement:** | I certify that I **DO NOT** employ or contract with an illegal immigrant. |
| **Contact E-mail:** | kwatson@edfinancial.com |
| **Submitted on:** | 05-04-15 |
| **Valid through:** | 05-02-16 |

1

**EXHIBIT 2, page 11**



## EQUAL EMPLOYMENT OPPORTUNITY

In order to provide equal employment and advancement opportunities to all individuals, employment decisions at Edfinancial will be based on merit, qualifications, and abilities.  Employment practices will not be influenced or affected by an applicant's or employee's race, color, religion, sex, sexual orientation, gender identity, national origin, age, genetic information, disability, veteran status, or any other characteristic or status protected by law.

This policy governs all aspects of employment, including selection, job assignment, compensation, discipline, termination, and access to benefits and training.

Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or the Human Resources Department.  Employees can raise concerns and make reports in good faith without any fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

13

**EXHIBIT 2, page 12**

# CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM

Failure to complete all of the following information may result in a delay in obtaining a contract, lease, purchase agreement, or grant award with any Arkansas State Agency.

SUBCONTRACTOR: SUBCONTRACTOR NAME:

☐ Yes ☒ No

TAXPAYER ID NAME: Edfinancial Services, LLC IS THIS FOR: ☐ Goods? ☒ Services? ☐ Both?

YOUR LAST NAME: Hollin FIRST NAME: William M.I.: A.

ADDRESS: 298 North Seven Oaks Drive

CITY: Knoxville STATE: Tennessee ZIP CODE: 37922 COUNTRY: USA

***AS A CONDITION OF OBTAINING, EXTENDING, AMENDING, OR RENEWING A CONTRACT, LEASE, PURCHASE AGREEMENT, OR GRANT AWARD WITH ANY ARKANSAS STATE AGENCY, THE FOLLOWING INFORMATION MUST BE DISCLOSED:***

## FOR INDIVIDUALS*

Indicate below if: you, your spouse or the brother, sister, parent, or child of you or your spouse *is* a current or former: member of the General Assembly, Constitutional Officer, State Board or Commission Member, or State Employee:

| Position Held | Mark (√) | | Name of Position of Job Held [senator, representative, name of board/ commission, data entry, etc.] | For How Long? | | What is the person(s) name and how are they related to you? [i.e., Jane Q. Public, spouse, John Q. Public, Jr., child, etc.] | |
|---|---|---|---|---|---|---|---|
| | Current | Former | | From MM/YY | To MM/YY | Person's Name(s) | Relation |
| General Assembly | | | | | | | |
| Constitutional Officer | | | | | | | |
| State Board or Commission Member | | | | | | | |
| State Employee | | | | | | | |

☐ None of the above applies

## FOR AN ENTITY (BUSINESS)*

Indicate below if any of the following persons, current or former, hold any position of control or hold any ownership interest of 10% or greater in the entity: member of the General Assembly, Constitutional Officer, State Board or Commission Member, State Employee, or the spouse, brother, sister, parent, or child of a member of the General Assembly, Constitutional Officer, State Board or Commission Member, or State Employee. Position of control means the power to direct the purchasing policies or influence the management of the entity.

| Position Held | Mark (√) | | Name of Position of Job Held [senator, representative, name of board/commission, data entry, etc.] | For How Long? | | What is the person(s) name and what is his/her % of ownership interest and/or what is his/her position of control? | | |
|---|---|---|---|---|---|---|---|---|
| | Current | Former | | From MM/YY | To MM/YY | Person's Name(s) | Ownership Interest (%) | Position of Control |
| General Assembly | | | | | | | | |
| Constitutional Officer | | | | | | | | |
| State Board or Commission Member | | | | | | | | |
| State Employee | | | | | | | | |

☒ None of the above applies

## Contract and Grant Disclosure and Certification Form

*Failure to make any disclosure required by Governor's Executive Order 98-04, or any violation of any rule, regulation, or policy adopted pursuant to that Order, shall be a material breach of the terms of this contract. Any contractor, whether an individual or entity, who fails to make the required disclosure or who violates any rule, regulation, or policy shall be subject to all legal remedies available to the agency.*

**As an additional condition of obtaining, extending, amending, or renewing a contract with a *state agency* I agree as follows:**

1.  Prior to entering into any agreement with any subcontractor, prior or subsequent to the contract date, I will require the subcontractor to complete a **CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM**. Subcontractor shall mean any person or entity with whom I enter an agreement whereby I assign or otherwise delegate to the person or entity, for consideration, all, or any part, of the performance required of me under the terms of my contract with the state agency.

2.  I will include the following language as a part of any agreement with a subcontractor:

    *Failure to make any disclosure required by Governor's Executive Order 98-04, or any violation of any rule, regulation, or policy adopted pursuant to that Order, shall be a material breach of the terms of this subcontract. The party who fails to make the required disclosure or who violates any rule, regulation, or policy shall be subject to all legal remedies available to the contractor.*

3.  No later than ten (10) days after entering into any agreement with a subcontractor, whether prior or subsequent to the contract date, I will mail a copy of the **CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM** completed by the subcontractor and a statement containing the dollar amount of the subcontract to the state agency.

---

*I certify under penalty of perjury, to the best of my knowledge and belief, all of the above information is true and correct and that I agree to the subcontractor disclosure conditions stated herein.*

| | | |
|---|---|---|
| Signature | Title President/CEO | Date 05/04/2015 |
| Vendor Contact Person John Farinella | Title EVP/COO | Phone No. 865-342-5555 |

---

Agency use only     *ARKANSAS*

| | | | | |
|---|---|---|---|---|
| Agency Number *0347* | Agency Name *Student Loan Authority* | Agency Contact Person *M. Cosine* | Contact Phone No. *682-2952* | Contract or Grant No. *Acct 34226* |

**EXHIBIT 2, page 14**

# PROGRAM ADMINISTRATION AGREEMENT

### BETWEEN

### EDFINANCIAL SERVICES, LLC
### AND
### THE ARKANSAS STUDENT LOAN AUTHORITY

THIS PROGRAM ADMINISTRATION AGREEMENT (the "Agreement") is entered into as of the 1st day of July, 2015 by and between EDFINANCIAL SERVICES, LLC, a Nevada limited liability company ("Edfinancial"), and the ARKANSAS STUDENT LOAN AUTHORITY (the "Authority"), a body politic and corporate and an instrumentality of the State of Arkansas created by and operating under Act 873 of the Acts of Arkansas of 1977, as amended (codified at Arkansas Code Annotated, Sections 6-81-101 *et seq.*) (the "Authority Act"). Edfinancial and the Authority are sometimes herein collectively referred to as the "Parties."

### RECITALS:

WHEREAS, the Authority is organized and exists, among other things, for the purposes of making or acquiring educational loans ("Loans") under and in accordance with the provisions of the federal Higher Education Act of 1965, as amended (the "Act") and, under certain circumstances described in the Authority Act, making or acquiring alternative loans ("Alternative Loans") not made under the Act (collectively, the "Loan Programs") to provide financing and other assistance to eligible borrowers for postsecondary educational endeavors, including the issuance from time to time of its bonds and other debt obligations to finance such Loans and/or Alternative Loans; and

WHEREAS, the payment of a substantial portion of the principal of and interest on Loans so made or acquired is guaranteed by guarantee agencies and reinsured in whole or in part pursuant to the Act by the Secretary of Education (the "Secretary"), or insured by the Secretary pursuant to the Act; and

WHEREAS, Edfinancial has management and personnel experienced in program development and administration of programs for funding Loans and is willing to contract for and provide support for the development and administration of the Authority's Loan Programs and for the marketing, making and acquiring of Loans on behalf of the Authority.

NOW, THEREFORE, the parties hereto, in consideration of the mutual promises hereinafter set forth, do covenant and agree as follows:

1. ***Term of Agreement***. The initial term of this Agreement shall be for a period beginning on the date first herein mentioned and ending on June 30, 2017. The Authority shall, on or before May 1, 2017, provide written notice to Edfinancial of whether it intends to seek approval of an agreement between the Parties for an additional two-year term. If the Authority does intend to seek approval for an additional two-year agreement between the Parties, it shall immediately thereafter begin negotiating in good faith to arrive at terms mutually acceptable to the Authority and Edfinancial. Upon reaching agreement with Edfinancial, the Authority shall use its best efforts to

obtain all necessary approvals of an agreement covering a two-year period beginning on July 1, 2017 and ending on June 30, 2019.  The Authority shall, on or before May 1, 2019, provide written notice to Edfinancial of whether it intends to seek approval of an agreement between the Parties for an additional two-year term.  If the Authority does intend to seek approval for an additional two-year agreement between the Parties, it shall immediately thereafter begin negotiating in good faith to arrive at terms mutually acceptable to the Authority and Edfinancial.  Upon reaching agreement with Edfinancial, the Authority shall use its best efforts to obtain all necessary approvals of an agreement covering a two-year period beginning on July 1, 2019 and ending on June 30, 2021.

2.      *Services to be Provided by Edfinancial.*

2.1     Services Generally.  In accordance with and subject in all respects to the policies established from time to time by the Authority, from and after the effective date hereof, Edfinancial will serve as Program Administrator and perform all necessary administrative and related activities for the Authority with respect to the Authority's Loan Programs, including providing staff and personnel for office operations and communications with firms and persons with which the Authority does business in connection with its Loan Programs, including, but not limited to, schools and their financial aid offices, banks and other lenders, and other program participants.  In connection herewith, Edfinancial will provide and maintain offices in Knoxville, Tennessee and in the area of Little Rock, Arkansas, and subsequently in such other locations in Arkansas as may be designated by the Authority; provided, however, the opening and operation of any additional offices shall be an obligation of Edfinancial only after the Authority has agreed to make any reasonably necessary adjustments in the fees payable to Edfinancial hereunder or to otherwise cover the costs of such additional offices in a manner acceptable to Edfinancial.  The services to be provided by Edfinancial will include, but not be limited to, the following:

(a)     secure necessary office space and maintain a business address in the area of Little Rock, Arkansas from which program administrative functions hereunder will be conducted;

(b)     provide professional management and personnel, as needed, in order to insure the efficiency and successful operation of the Loan Programs of the Authority; and such management and personnel must demonstrate the ability and experience necessary to perform the responsibilities described below;

(c)     develop or acquire all materials, brochures, computer capacity and software programs associated with the provision of student outreach services for high schools and counselors, including, but not limited to, college fairs, financial aid seminars, and attendance at high school counselor conferences;

(d)     develop promotional and educational materials, including but not limited to:

i.      Financial aid awareness materials
ii.     Advertising
iii.    Promotional items
iv      Sponsorships
v.      Print materials

EXHIBIT 2, page 16

(e)   acquire supplies, equipment, communications equipment and furnishings necessary for conducting administrative activities as contemplated by the parties;

(f)   with the approval of the Authority, fund or arrange for the funding of purchases of portfolios of Loans from third-party lenders on terms and subject to conditions acceptable to Edfinancial in circumstances where the Authority is unwilling or unable to fund such purchases;

(g)   provide the Authority with all necessary data and information for the Authority's financial statements and reports;

(h)   provide webhosting for all of the Authority's websites, including development and maintenance of same;

(i)   administer the Authority's office IT network and software and provide general administrative services related to IT;

(j)   assist the Authority in procuring Arkansas nexus loans through secondary market activities;

(k)   provide ongoing administrative client and school support and relationship development;

(l)   provided default prevention related services and support (as set forth below in Section 2.2); and

(m)   pay all expenses associated with the above, including, but not limited to, salaries, travel, utilities, supplies, mailing, rent, maintenance and equipment, including computers and other machinery, as applicable, and the reasonable cost of print materials that are related to the marketing and administration of In furtherance of the foregoing, Edfinancial agrees to pay to the Authority the amount of $4,000 per month in exchange for Edfinancial's use of certain office space owned by the Authority in connection with the performance of Edfinancial's duties hereunder.

2.2   <u>Default Prevention System and Operational Support</u>. Upon the request of the Authority and upon the mutual agreement of the Parties in each instance, Edfinancial shall assist the Authority in its provision of default prevention services to Arkansas postsecondary schools by providing to the Authority operational support and access to a default prevention system (collectively, the "Edfinancial Default Management Services"). The Authority shall include Edfinancial in preliminary discussions with any Arkansas postsecondary institution ("Arkansas School") to which the Authority desires to provide Default Prevention Services. Edfinancial and the Authority must agree in advance to all terms of any proposed term sheet and contract between the Authority and any Arkansas School for the provision of Default Prevention Services and with respect to which the Authority desires Edfinancial to provide the Edfinancial Default Management Services, including, but not limited to, the pricing to be offered to any Arkansas School.

3. ***Continuation of the Authority and Authority Responsibilities.*** The Authority shall continue its existence during the term hereof and shall be responsible for the management, administration and funding of all other programs of the Authority and the funding of the making and/or acquisition of Loans and Alternative Loans, it being the intention of the parties that Edfinancial is only responsible for the administration of the Loan Programs, but not other programs of the Authority or, except as provided in subparagraph (g) above, the funding, through bonds or other indebtedness, of Loans and alternative loans.

4. ***Payment for Services.*** The Authority agrees that in consideration of the services provided by Edfinancial, it shall pay Edfinancial a monthly Program Administration fee ("Program Fee") as follows:

      (a)     one-twelfth (1/12th) of 0.0825% of the aggregate principal amount of total assets held by the Authority at the end of each calendar month, payable not later than the end of the calendar month following that for which said fee is payable, with the fee for partial months, if any, being prorated based upon the actual days elapsed during the fee period; and

      (b)     Edfinancial's compensation for the provision of the Edfinancial Default Management Services shall be ninety percent (90%) of the revenue generated by each Default Prevention Services contract between the Authority and an Arkansas School and with respect to which Edfinancial has provided Edfinancial Default Management Services.

      (c)     The Program Fee for the renewal period commencing on July 1, 2017 and thereafter may be adjusted by Edfinancial upon written notice from Edfinancial to the Authority not less than ninety (90) days in advance of the date upon which the proposed adjustment is to be effective, and such adjustment shall take effect from and after the proposed effective date unless the Authority notifies Edfinancial in writing prior to such effective date that such adjustment is unacceptable to the Authority. In the event of such a notice from the Authority, the parties' respective representatives shall meet and try in good faith to reach agreement with respect to the Program Fee. If no agreement is reached, then Edfinancial may either:

           (i)     continue to perform its obligations under this Agreement in which case the Authority shall continue to pay the Program Fee in effect immediately prior to the most recent notice of adjustment from Edfinancial; or

           (ii)     by written notice to the Authority, terminate this Agreement effective on the earlier of the end of the then current term of this Agreement or ninety (90) days after the date of such termination notice.

5. ***Representations and Warranties of Edfinancial.*** Edfinancial represents and warrants to and covenants with the Authority as follows:

      (a)     Edfinancial is a limited liability company duly organized, validly existing, and in good standing under the laws governing its creation and existence and is duly authorized and qualified to transact any and all business contemplated by this Agreement and possesses all requisite authority,

**EXHIBIT 2, page 18**

power, licenses, permits and franchises to conduct its business and to execute, deliver and comply with its obligations under the terms of this Agreement, the execution, delivery and performance of which have been duly authorized by all necessary action.

       (b)    The execution and delivery of this Agreement by Edfinancial in the manner contemplated herein and the performance and compliance with the terms hereof by it will not violate or conflict with (i) the instruments creating Edfinancial or governing its operations, or (ii) any laws which could have any material adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of this Agreement applicable to Edfinancial, and will not constitute a default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the breach of, any material contract, agreement or other instrument to which Edfinancial is a party or which may be applicable to Edfinancial or any of its assets.

       (c)    This Agreement, and all documents and instruments contemplated hereby, which are executed and delivered by Edfinancial, will constitute valid, legal and binding obligations of Edfinancial, enforceable in accordance with their respective terms except as the enforcement thereof may be limited by bankruptcy, insolvency,  reorganization or other laws or equitable principles affecting creditors' rights generally.

       (d)    Edfinancial's computer system, including all manufacturer-supplied and other software not owned by Edfinancial, has been or will be, as applicable, procured by Edfinancial under valid licenses from the equipment manufacturer or other owners thereof, and Edfinancial is not now, nor will be, during the term of this Agreement in default under any such license. Edfinancial will not utilize any systems or portions thereof, including software, during the term of this Agreement in a manner which might cause Edfinancial to infringe upon or violate the rights of any owner thereof.

       (e)    No information, certificate of an officer of Edfinancial, statement furnished in writing, or report required hereunder delivered to the Authority, the Authority's bond trustee (the "Trustee") or any other person as may from time to time be designated by the Authority to receive same, will, to the knowledge of Edfinancial, contain any untrue statement of a material fact or omit a material fact necessary to make the information, certificate, statement or report not misleading.

       (f)    No litigation is pending or, to the best of Edfinancial's knowledge, threatened against Edfinancial which would prohibit its entering into this Agreement or consummating the transactions contemplated herein.

       (g)    Edfinancial shall maintain Faithful Performance Blanket Bond Coverage or other fidelity bond or insurance of similar type acceptable to the Authority and the Trustee and such bond or insurance shall be subject to a maximum claim coverage of not less than $200,000.00 on any one loss.  Edfinancial further covenants that during the terms of this Agreement it shall notify the Trustee and the Authority if for any reason it shall fail to remain entitled to at least such benefits and coverage, and in such event, to the extent permitted by applicable law or regulation in the State of Arkansas, it shall obtain such other insurance policies and coverage as shall be acceptable to the Trustee and the Authority.  Failure to obtain such other insurance policies and coverage shall, in the sole judgment of the Authority, be a ground for termination of this Agreement.

---

(h)     Edfinancial will furnish to or permit inspection by the Authority of such financial information and program documentation with respect to the operations of Edfinancial as the Authority may reasonably request from time to time.

(i)     In performing the Services hereunder, Edfinancial will be guided by and comply with all applicable state and federal laws as may be in effect from time to time when published in final form.

6.     ***Representations and Warranties of the Authority***.  The Authority represents and warrants to and covenants with Edfinancial as follows:

(a)     The Authority is duly organized, validly existing, and in good standing under the laws governing its creation and existence and is duly authorized and qualified to transact any and all business contemplated by this Agreement and possesses all requisite authority, power, licenses, permits and franchises to conduct its business and to execute, deliver and comply with its obligations under the terms of this Agreement, the execution, delivery and performance of which have been duly authorized by all necessary action.

(b)     The execution and delivery of this Agreement by the Authority in the manner contemplated herein and the performance and compliance with the terms hereof by it will not violate or conflict with (i) the laws and instruments creating the Authority or governing its operations, or (ii) any laws which could have any material adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of this Agreement applicable to the Authority, and will not constitute a default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the breach of, any material contract, agreement or other instrument to which the Authority is a party or which may be applicable to the Authority or any of its assets.

(c)     Upon their due execution and delivery by all other parties thereto, this Agreement, and all documents and instruments contemplated hereby, which are executed and delivered by the Authority, will constitute valid, legal and binding obligations of the Authority, enforceable in accordance with their respective terms except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles affecting creditors' rights generally.

(d)     No information, certificate of an officer of the Authority, statement furnished in writing, or report required hereunder delivered to Edfinancial or any other person as may from time to time be designated by the Edfinancial to receive same, will, to the knowledge of the Authority, contain any untrue statement of a material fact or omit a material fact necessary to make the information, certificate, statement or report not misleading.

(e)     No litigation is pending or, to the best of the Authority's knowledge, threatened against the Authority which would prohibit its entering into this Agreement or consummating the transactions contemplated herein.

(f)     The Authority will furnish to Edfinancial its then most recent certified annual

---

financial statement within ninety (90) days of board approval. Edfinancial warrants to the Authority that the financial statements shall not be disclosed or in any way communicated to third parties without the express written consent of the Authority, except that such may be disclosed to the trustee and to credit rating agencies, credit enhancers of the Authority's bonds, or any successors thereto.

(g)     In performing its obligations hereunder, the Authority will be guided by and comply with all applicable state and federal laws as may be in effect from time to time when published in final form.

7.     *Indemnification.*  Edfinancial agrees to pay the Authority for any  loss, liability or expense incurred by the Authority, including reasonable attorney's fees, which arise out of or relate to Edfinancial's acts or omissions with respect to its obligations under this Agreement; provided, however, it shall be a condition precedent to the obligation of Edfinancial to make any such payment that the Authority promptly, but in no event less than seven (7) days after the Authority obtains knowledge thereof, provide Edfinancial with written notice of each claim or other event for which Edfinancial could be liable hereunder unless Edfinancial already has actual knowledge thereof. Edfinancial shall have the right to participate fully with the Authority in all administrative and judicial proceedings in connection with any matter with respect to which Edfinancial might be liable hereunder and the Authority shall not agree to any compromise or settlement with respect thereto without the prior written consent of Edfinancial.  This provision shall not be construed to limit Edfinancial's or the Authority's rights, obligations, liabilities, claims or defenses which arise as a matter of law or pursuant to any other provisions of this Agreement.

8.     *Force Majeure.*  If either party anticipates being unable or is rendered unable, wholly or in part, by a force outside the control of the parties (including, but not limited to, acts of God, legislative enactments, strikes, lock-outs, riots, acts of war, epidemics, fire, communication line or power failure, earthquakes or other disasters) to carry out its obligations under this Agreement, that party shall give to the other party prompt written notice to that effect, the expected duration of the inability to perform and assurances that all available means will be employed to continue and/or restore performance. Upon receipt of the written notice, the affected obligations of the party giving the notice shall be suspended so long as such party is reasonably unable to so perform and such party shall have no liability to the other for the failure to perform any suspended obligation during the period of suspension; however, the other party may at its option terminate this Agreement.

9.     *Disputes.*  In the event of any dispute or disagreement between the parties hereto either with respect to the interpretation of any provision of this Agreement or with respect to the performance hereunder by Edfinancial or by the Authority under this Agreement, each of the parties will appoint a designated officer to meet for the purpose of endeavoring to resolve such dispute or to negotiate for an adjustment to such provision.  In case no agreement is reached, a third designated person may be appointed upon mutual agreement to resolve such dispute or to negotiate with the previously designated officers for an adjustment to such provision.  No formal proceedings for the judicial resolution of such dispute, other than proceedings seeking injunctive or restraining relief in order to maintain the status quo may be commenced until either of the designated officers concludes in good faith that amicable resolution through continued negotiations of the matter in issue does not appear likely.

**EXHIBIT 2, page 21**

10.    ***Miscellaneous Provisions.***

(a)    *Confidential Information.*    During the term of this Agreement, and thereafter, each party and its respective agents and employees will, to the maximum extent permitted by applicable law, maintain the confidentiality of all data, materials and information disclosed and entrusted to it by the other party which relate to the business relationship of the parties. Edfinancial agrees to keep the names and addresses of borrowers of the Authority in strictest confidence, except as shall be necessary to communicate the information to its officers and employees or to the Authority in connection with its obligations under this Agreement or any trust indenture or other instrument to which the Authority is a party as a result of an Authority indebtedness and except as required by applicable legal order or process, law or regulation. Edfinancial shall employ all reasonable and necessary means to safeguard the information from fire, flood, theft, unauthorized disclosure or other hazard, whether natural or man-made. Edfinancial and the Authority shall use their best efforts to ensure compliance with the terms of this paragraph by their respective directors, officers, employees and subcontractors.

(b)    *Inspections.*    All records and reports specifically relating to the services of Edfinancial hereunder shall be subject to review, audit and copying by the Authority, its designated representative or any other regulatory body or supervisory authority having jurisdiction over the Authority or Edfinancial at any time or times during normal business hours. Such review, audit and copying shall be conducted, unless otherwise mutually agreed upon, at Edfinancial's principal office for providing services hereunder or as otherwise maintained by Edfinancial. On-site examination of documents held in safekeeping and microfilm records or related documentation will be performed with as little disruption as possible to Edfinancial's normal operations. All questions arising during the course of the audit will be coordinated by the chief auditor and directed to the individual(s) designated by Edfinancial. Edfinancial will designate a sufficient number of liaison personnel so as to be able to respond timely to audit questions. All Authority out-of-pocket expenses relating to such review, audit and copying shall be borne by the Authority.

(c)    *Notices.*    All notices, approvals, consents, requests or other written communications regarding this Agreement are to be addressed as follows:

If to the Authority:

Arkansas Student Loan Authority
3801 Woodland Heights Road, Suite 200
Little Rock, Arkansas 72212
Attention: Chief Executive Officer

If to Edfinancial:

Edfinancial Services, LLC
298 North Seven Oaks Drive
Knoxville, Tennessee 37922
Attention: Chief Executive Officer

**EXHIBIT 2, page 22**

(d) *Relationship.* The parties to this Agreement intend that Edfinancial shall render the services contemplated by this Agreement as an independent contractor. Edfinancial and its employees, agents, and servants are not to be considered agents or employees of the Authority for any purpose whatsoever. Nothing herein contained, nor any action taken by Edfinancial under this Agreement, shall be deemed or construed to give Edfinancial any right, title or interest either in law or in equity in and to any loan account being purchased or otherwise acquired by or on behalf of the Authority.

(e) *Competition.* Edfinancial agrees that so long as this Agreement is in effect, Edfinancial will not conduct any business in the State of Arkansas involving the making or acquiring of the type of Loans or Alternative Loans made or acquired by the Authority without the prior written consent of the Authority.

(f) *Severability.* In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof. Such invalid or unenforceable provisions shall be amended, if possible, in order to accomplish the purposes of this Agreement.

(g) *Limitation on Liability of Parties.* Each party to this Agreement shall be liable under this Agreement only to the extent that obligations are imposed upon the party against whom enforcement is sought.

(h) *Limitation on Liability of Directors, Officers, Members, Employees and Agents of a Party.* No director, officer, member, employee, or agent of any party to this Agreement shall be liable to any other party or to the bond trustee, credit enhancers or bondholders for the taking of any action or from refraining to take any action in good faith pursuant to this Agreement or to bondholders under any circumstances as a result of this Agreement.

(i) *Assignments.* This Agreement and all rights and obligations of Edfinancial hereunder may be assigned or subcontracted by Edfinancial with the prior written consent of the Authority which consent shall not be unreasonably withheld; provided, however, unless otherwise expressly agreed by the parties, the Authority's consent to such assignment or subcontract shall not release Edfinancial from its obligations under this Agreement.

(j) *Entire Understanding.* This Agreement represents the entire understanding of the parties with respect to its subject matter, and supersedes all previous discussions and correspondence with respect thereto, and no representations, warranties or agreements, express or implied, of any kind with respect to such subject matter have been made by either party to the other, except as expressly set forth herein.

(k) *Amendments.* Amendments to this Agreement shall be in writing, signed by a representative of each party, and shall be incorporated into this Agreement.

(l) *Financial Statements.* Edfinancial will furnish to the Authority Edfinancial's then most recent certified annual financial statement within thirty (30) days of final approval. The

**EXHIBIT 2, page 23**

Authority warrants to Edfinancial that the financial statements shall not be disclosed or in any way communicated to third parties without the express written consent of the Edfinancial, except that such may be disclosed to the Authority's bond trustee or any successor trustee or credit provider.

11.    *Termination.*  This Agreement may be terminated as follows:

(a)    by Edfinancial as provided in Section 4(c);

(b)    by either party upon a material breach of this Agreement by the other party, on not less than one hundred fifty (150) days' written notice, unless the breach is cured within the notice period;

(c)    with respect to either Party, if such entity shall under such laws as shall be applicable to it commence any case or proceeding, or file any petition, in bankruptcy, or for reorganization, liquidation or dissolution, or be adjudicated insolvent or bankrupt, or shall apply to any tribunal for a receiver, intervenor, conservator or trustee for itself or for any substantial part of its property; or if there shall be commenced against it any such action and the same shall remain undismissed, or if by any act it shall indicate its consent to, approval of, of acquiescence in any such proceeding, or the appointment of any receiver, intervenor, conservator or trustee for it or any substantial part of its property or shall suffer any of the same to continue undischarged; or if it shall become subject to any intervention whatsoever that shall deprive it of the management of the aggregate of its property or any substantial part thereof; or if it shall wind up or liquidate its affairs or there shall be issued a warrant of attachment, execution or similar process against any substantial part of its property, and such warrant, execution or process shall remain undismissed, unbonded or undischarged for a period of thirty (30) days, the other party shall have the right to terminate this Agreement immediately upon the occurrence of such event; or

(d)    at the option of Edfinancial, if the Servicing Agreement being contemporaneously executed by the Parties is terminated by Edfinancial due to the Authority's breach, or, at the option of the Authority if the Servicing Agreement is terminated by the Authority due to Edfinancial's breach.

Upon termination or expiration of this Agreement, Edfinancial shall, regardless of any Authority default or any other reason, return to the Authority all records, data processing records, reports, documents and correspondence maintained by Edfinancial in connection with the administration of the Loan Programs of the Authority.  The return of the records belonging to the Authority shall be done at the Authority's sole cost and expense and in such manner as the Authority may reasonably request, within sixty (60) days from the date of termination/expiration or as otherwise mutually agreed upon by the parties.

12.    *Effective Date.*  This Agreement shall be and become effective on and after date first above written.

13.    *Law Governing.*  This Agreement is being delivered in and shall be construed in accordance with the laws of the State of Arkansas.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be fully executed as of the day and the year first above written.

ARKANSAS STUDENT LOAN AUTHORITY

By: _____
      Tony Williams   Director

Attest:

EDFINANCIAL SERVICES, LLC

By: _____
      Wm. Anthony Holfin, President

**EXHIBIT 2, page 26**



# STATE OF ARKANSAS
## AMENDMENT TO PROFESSIONAL CONSULTANT SERVICES CONTRACT

CONTRACT #: 4600034526 - 41                    AMENDMENT #: 1

1. **CONTRACTING PARTIES:**

| AGENCY NUMBER & NAME | 0347 | Arkansas Student Loan Authority | | 7. Service Bureau |
|---|---|---|---|---|
| VENDOR NAME | Edfinancial Services LLC (Program Administration) | | | |
| TRACKING # 1 | N/A | | TRACKING # 2 | N/A |

2. **NEW CONTRACT EXPIRATION DATE:**                06/30/2019

mm dd yyyy (if not extending contract to new date, please leave blank)

3. **PURPOSE OF AMENDMENT:**
Extend contract expiration date and amend compensation

4. **AMENDED DOLLAR AMOUNT:**

For each amendment involving a change in the contract dollar amount, enter the previous contract amounts. Enter this amendment's amounts showing (+) for increase and (-) for decrease in compensation and/or reimbursable expenses. Enter the new total compensation and/or reimbursable expenses for this contract. Note: Any increase in the rate of compensation must be accompanied by a copy of the original contract language authorizing such increase

|  | PREVIOUS | THIS AMENDMENT | NEW TOTAL |
|---|---|---|---|
| COMPENSATION | $ 1,200,000.00 | $ 1,000,000.00 | $ 2,200,000.00 |
| EXPENSE | $ | $ | $ |
| TOTAL | $ 1,200,000.00 | $ 1,000,000.00 | $ 2,200,000.00 |

Total dollar amount paid on contract as of this date  $  840,349.59  as of  03/31/2017

| UPDATED TOTAL PROJECTED COST | $ | |
|---|---|---|

5. **NEW AND/OR REVISED ATTACHMENTS:**

EXCEPT AS SPECIFICALLY AMENDED HEREIN (OR AS ATTACHED) ALL OTHER TERMS AND CONDITIONS OF THE ABOVE REFERENCED CONTRACT REMAIN UNCHANGED

6. **SIGNATURES:**

_____  4/28/17          _____  5/2/17
VENDOR                       DATE            AGENCY DIRECTOR               DATE

William A. Hollin, President & CEO            Tony Williams, Executive Director
TITLE                                         TITLE

298 North Seven Oaks Drive, Knoxville, TN 37922    3801 Woodland Heights Rd. Ste 200, Little Rock, AR 72212
ADDRESS                                            ADDRESS

APPROVED:  _____            5/22/17 dh
           DEPARTMENT OF FINANCE AND ADMINISTRATION   DATE

FORM PCS-1A                    Page 1 of 2                    8/1/2015

**EXHIBIT 2, page 27**

# STATE OF ARKANSAS
## AMENDMENT TO PROFESSIONAL CONSULTANT SERVICES CONTRACT

CONTRACT #: 4600034526      AMENDMENT #: 1

**7. AGENCY CONTACTS FOR QUESTION(S) REGARDING THIS CONTRACT:**

**Contact #1 – Agency Representative submitting/tracking this contract**

| Rose Brooke | Executive Assistant |
|---|---|
| (Name) | (Title) |
| 501-682-2952 | rbrooke@asla.info |
| (Telephone #) | (Email) |

**Contact #2 – Agency Representative with knowledge of this project (for general questions and responses)**

| Mark Conine | CFO |
|---|---|
| (Name) | (Title) |
| 501-682-2952 | mconine@asla.info |
| (Telephone #) | (Email) |

**Contact #3 – Agency Representative Director or Critical Contact (for time sensitive questions and responses)**

| Tony Williams | Executive Director |
|---|---|
| (Name) | (Title) |
| 501-682-2952 | twilliams@asla.info |
| (Telephone #) | (Email) |

**8. SOURCE OF FUNDS:**

Complete appropriate box(es) below to total 100% of the funding in this contract to date.

| Fund Source | Identify Source of Funds | Fund | Fund Center | Amount of Funding | % of Total Contract Cost |
|---|---|---|---|---|---|
| Cash Funds | Revenue Bond Proceeds | 157 | A51 | $ 2,200,000.00 | 100.00 |
|  |  |  |  | $ |  |
|  |  |  |  | $ |  |
|  |  |  |  | $ |  |
|  |  |  |  | $ |  |
|  |  |  | TOTALS | $ 2,200,000.00 | 100% |

\* MUST BE SPECIFIC (i.e. fees, tuition, agricultural sales, bond proceeds, donations, etc.)

\*\* "State Funds" is defined as and deemed State General Revenue Dollars. If other state funds are being used such as tobacco funds, general improvement funds, etc., these should be noted. Special revenue funds from taxes or fees generated for the agencies should be shown as "Other" and the actual source of the funds should be clarified in the "Identify Source of Funds."

\*\*\* Funding and percentages shall reflect the total of the contract including all amendments to date.

**EXHIBIT 2, page 28**

## CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM

Failure to complete all of the following information may result in a delay in obtaining a contract, lease, purchase agreement, or grant award with any Arkansas State Agency.

SUBCONTRACTOR: ☐ Yes ☒No    SUBCONTRACTOR NAME:

TAXPAYER ID NAME: Edfinancial Services, LLC    IS THIS FOR: ☐ Goods?  ☒ Services? ☐ Both?

YOUR LAST NAME: Hollin    FIRST NAME: William    M.I.: A

ADDRESS: 298 North Seven Oaks Drive

CITY: Knoxville    STATE: TN    ZIP CODE: 37922    COUNTRY: U.S.A.

*AS A CONDITION OF OBTAINING, EXTENDING, AMENDING, OR RENEWING A CONTRACT, LEASE, PURCHASE AGREEMENT, OR GRANT AWARD WITH ANY ARKANSAS STATE AGENCY, THE FOLLOWING INFORMATION MUST BE DISCLOSED:*

### FOR INDIVIDUALS *

Indicate below if: you, your spouse or the brother, sister, parent, or child of you or your spouse is a current or former: member of the General Assembly, Constitutional Officer, State Board or Commission Member, or State Employee:

| Position Held | Mark (√) | | Name of Position of Job Held [senator, representative, name of board/ commission, data entry, etc.] | For How Long? | | What is the person(s) name and how are they related to you? [i.e., Jane Q. Public, spouse, John Q. Public, Jr., child, etc.] | |
|---|---|---|---|---|---|---|---|
| | Current | Former | | From MM/YY | To MM/YY | Person's Name(s) | Relation |
| General Assembly | | | | | | | |
| Constitutional Officer | | | | | | | |
| State Board or Commission Member | | | | | | | |
| State Employee | | | | | | | |

☒ None of the above applies

### FOR AN ENTITY (BUSINESS) *

Indicate below if any of the following persons, current or former, hold any position of control or hold any ownership interest of 10% or greater in the entity: member of the General Assembly, Constitutional Officer, State Board or Commission Member, State Employee, or the spouse, brother, sister, parent, or child of a member of the General Assembly, Constitutional Officer, State Board or Commission Member, or State Employee. Position of control means the power to direct the purchasing policies or influence the management of the entity.

| Position Held | Mark (√) | | Name of Position of Job Held [senator, representative, name of board/commission, data entry, etc.] | For How Long? | | What is the person(s) name and what is his/her % of ownership interest and/or what is his/her position of control? | | |
|---|---|---|---|---|---|---|---|---|
| | Current | Former | | From MM/YY | To MM/YY | Person's Name(s) | Ownership Interest (%) | Position of Control |
| General Assembly | | | | | | | | |
| Constitutional Officer | | | | | | | | |
| State Board or Commission Member | | | | | | | | |
| State Employee | | | | | | | | |

☒ None of the above applies

**EXHIBIT 2, page 29**

## Contract and Grant Disclosure and Certification Form

*Failure to make any disclosure required by Governor's Executive Order 98-04, or any violation of any rule, regulation, or policy adopted pursuant to that Order, shall be a material breach of the terms of this contract. Any contractor, whether an individual or entity, who fails to make the required disclosure or who violates any rule, regulation, or policy shall be subject to all legal remedies available to the agency.*

**As an additional condition of obtaining, extending, amending, or renewing a contract with a *state agency* I agree as follows:**

1.  Prior to entering into any agreement with any subcontractor, prior or subsequent to the contract date, I will require the subcontractor to complete a **CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM.** Subcontractor shall mean any person or entity with whom I enter an agreement whereby I assign or otherwise delegate to the person or entity, for consideration, all, or any part, of the performance required of me under the terms of my contract with the state agency.

2.  I will include the following language as a part of any agreement with a subcontractor:

    *Failure to make any disclosure required by Governor's Executive Order 98-04, or any violation of any rule, regulation, or policy adopted pursuant to that Order, shall be a material breach of the terms of this subcontract. The party who fails to make the required disclosure or who violates any rule, regulation, or policy shall be subject to all legal remedies available to the contractor.*

3.  No later than ten (10) days after entering into any agreement with a subcontractor, whether prior or subsequent to the contract date, I will mail a copy of the **CONTRACT AND GRANT DISCLOSURE AND CERTIFICATION FORM** completed by the subcontractor and a statement containing the dollar amount of the subcontract to the state agency.

---

*I certify under penalty of perjury, to the best of my knowledge and belief, all of the above information is true and correct and that I agree to the subcontractor disclosure conditions stated herein.*

Signature _____    Title President/CEO _____    Date 04/17/2017 _____

Vendor Contact Person John Farinella _____    Title EVP/COO _____    Phone No. 865-342-5555

---

*Agency use only*

| Agency Number | Agency Name | Agency Contact Person | Contact Phone No. | Contract or Grant No. |
|---|---|---|---|---|
| | | | | |

---

**EXHIBIT 2, page 30**

## EQUAL EMPLOYMENT OPPORTUNITY

In order to provide equal employment and advancement opportunities to all individuals, employment decisions at Edfinancial will be based on merit, qualifications, and abilities.  Employment practices will not be influenced or affected by an applicant's or employee's race, color, religion, sex, sexual orientation, gender identity, national origin, age, genetic information, disability, veteran status, or any other characteristic or status protected by law.

This policy governs all aspects of employment, including selection, job assignment, compensation, discipline, termination, and access to benefits and training.

Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or the Human Resources Department.  Employees can raise concerns and make reports in good faith without any fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

# DFA Illegal Immigrant Contractor Disclosure Certification

## DFA Illegal Immigrant Contractor Disclosure Certification View Submission Details

**Disclosure forms are valid for one year.**

| | |
|---|---|
| **Vendor:** | Edfinancial Services, LLC |
| **Tax ID:** | 6278 |
| **Disclosure Statement:** | I certify that I **DO NOT** employ or contract with an illegal immigrant. |
| **Contact E-mail:** | kwatson@edfinancial.com |
| **Submitted on:** | 04-26-17 |
| **Valid through:** | 04-25-18 |

**AMENDMENT NO. 1**
**TO**
**PROGRAM ADMINISTRATION AGREEMENT**

THIS AMENDMENT NO. 1 TO PROGRAM ADMINISTRATION AGREEMENT (this "Amendment") is dated effective as of _July 1_____, 2017 ("Effective Date") and is entered into between EDFINANCIAL SERVICES, LLC, a Nevada limited liability company ("Edfinancial"), and the ARKANSAS STUDENT LOAN AUTHORITY (the "Authority"), a body politic and corporate and an instrumentality of the State of Arkansas created by and operating under Act 873 of the Acts of Arkansas of 1977, as amended (codified at Arkansas Code Annotated, Sections 6-81-101 et seq.). Edfinancial and the Authority are sometimes herein collectively referred to as the "Parties."

RECITALS:

WHEREAS, the Authority and Edfinancial have entered into a Program Administration Agreement dated as of July 1, 2015 (as the same has been amended from time to time, the "Administration Agreement") pursuant to which Edfinancial has assists the Authority in administering the Authority's higher education Loan Programs (defined terms used herein but not otherwise defined shall have the same meanings assigned to such terms in the Administration Agreement); and

WHEREAS, pursuant to Section 1 of the Administration Agreement, the Authority desires to extend the term of the Administration Agreement through June 30, 2019.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained and other valuable considerations, the sufficiency of which is hereby mutually acknowledged, the parties hereby agree to amend the Administration Agreement as follows:

1. Extension of Term. Pursuant to Section 1 of the Administration Agreement, the parties hereby agree that the term of the Administration Agreement is hereby extended through June 30, 2019.

2. Fees. Section 4(a) of the Administration Agreement is hereby deleted in its entirety and the following is substituted therefor:

    (a)    one-twelfth (1/12th) of 0.0825% of the total principal balance of outstanding loans held by the Authority at the end of each calendar month, plus an additional monthly line item for mutually agreeable default management expense, all payable not later than the end of the calendar month following that for which said fee is payable, with the fee for partial months, if any, being prorated based upon the actual days elapsed during the fee period; and

3.  Continued Force and Effect.  All of the terms and conditions of the Administration Agreement, as modified hereby, are hereby ratified and confirmed in all respects and shall remain in full force and effect in accordance with their terms.

4.  Representations and Warranties. Each party hereby represents and warrants to the other party that this Amendment has been duly authorized, executed and delivered by such party and constitutes its legal, valid and binding obligation, enforceable against such party in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

5.  Governing Law. This Amendment shall be governed by, and construed and interpreted in accordance with, the law of the State of Arkansas without regard to conflict of laws principles thereof.

6.  Counterparts.  This Amendment may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

*[Signatures appear on following pages.]*

2

**EXHIBIT 2, page 34**

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized officers as of the date set forth above.

**THE ARKANSAS STUDENT LOAN AUTHORITY**

By: _____

Printed Name: ___TONY WILLIAMS_____

Title: ___DIRECTOR_____

**EDFINANCIAL SERVICES, LLC**

By: _____

Wm. Anthony Hollin, President

3

**EXHIBIT 2, page 35**